James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

*Co-Counsel for Plaintiffs and the Proposed Class*
*(additional counsel on signature page)*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| GILLES COHEN and JOHN MICKLO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SUBARU CORPORATION and SUBARU OF AMERICA, INC., <br><br> Defendants. | Civil Action No. _____ <br><br><br> **CLASS ACTION COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................1

II.     PARTIES ..........................................................................3

    A.      Plaintiffs ...............................................................3

        1.      Plaintiff Gilles Cohen .............................................4

        2.      Plaintiff John Micklo .............................................5

    B.      Defendants ...........................................................6

        1.      Subaru Corporation ...............................................6

        2.      Subaru of America, Inc. .........................................7

III.    JURISDICTION ...............................................................8

IV.     VENUE ..............................................................................9

V.      FACTUAL ALLEGATIONS ...........................................9

    A.      Subaru's History of Defective Fuel Delivery Systems ............9

    B.      Subaru Has Not Remedied the Fuel Pump Defect in Affected Vehicles ..............................................10

    C.      NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks ...............................................11

        1.      Pre-2019 Vehicles with the Defective Pump .............................11

        2.      Recalled Vehicles .............................................26

        3.      Other Subaru Models Not Included .............................................27

        4.      Affected 2020 Vehicles .............................................32

    D.      Subaru Sells, Markets, and Advertises Subaru and Lexus Brand Vehicles as Safe and Reliable ............................33

    E.      Plaintiffs and Class Members Would Not Have Purchased or Leased, or Would Have Paid Less for, Affected Vehicles Had They Known of the Fuel Pump Defect ............................40

    F.     Subaru Has Manipulated Its Warranty to Minimize Its Obligation to Fix the Fuel Pump Defect in Affected Vehicles .................................................41

    G.    Allegations Establishing Agency Relationship Between Manufacturer Subaru and Subaru Dealerships. ......................................................42

VI.    TOLLING OF THE STATUTE OF LIMITATIONS..........................................44

    A.    Discovery Rule Tolling...............................................................................44

    B.    Fraudulent Concealment Tolling ...............................................................45

    C.    Estoppel......................................................................................................46

VII.    CHOICE OF LAW ALLEGATIONS.................................................................46

VIII.    CLASS ALLEGATIONS ...................................................................................46

    A.    Claims Brought on Behalf of the Nationwide Class ..................................50

COUNT I  VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.* THE MAGNUSON-MOSS WARRANTY ACT......................................................................................50

COUNT II  FRAUDULENT CONCEALMENT (BASED ON COMMON LAW) ...................52

COUNT III  BREACH OF CONTRACT (COMMON LAW)........................................55

COUNT IV  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) .......................................56

COUNT V  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.J. STAT. ANN. § 12A:2-314) .................................................58

COUNT VI  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BASED ON NEW JERSEY STATE LAW) .................................................60

    B.    Claims Brought on Behalf of the Florida Subclass...............................61

COUNT VII  VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") (FLA. STAT. ANN. § 501.201, *ET SEQ.*) .................................................61

COUNT VIII  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (FLA. STAT. ANN. §§ 672.314 AND 680.212)......................63

COUNT IX  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BASED ON FLORIDA STATE LAW) ........................................65

    C.    Claims Brought on Behalf of the Minnesota Subclass .........................66

COUNT X  VIOLATION OF THE MINNESOTA PREVENTION OF
     CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*) .................................66

COUNT XI  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
     (MINN. STAT. § 336.2-314) .............................................................................................68

COUNT XII BREACH OF COVENANT OF GOOD FAITH AND FAIR
     DEALING (BASED ON MINNESOTA STATE LAW) ..................................................70

REQUEST FOR RELIEF ...........................................................................................................71

DEMAND FOR JURY TRIAL ..................................................................................................73

Plaintiffs Gilles Cohen and John Micklo, on behalf of themselves and all others similarly situated (the "Class"), allege the following based upon the investigation of counsel and information and belief as noted.

## I.    INTRODUCTION

1.    One of the most significant advancements in the internal combustion engine over the last 30 years has been the widespread adoption of fuel injection systems instead of carburetors to supply fuel to the engine. The fuel injection system uses fuel pumps to efficiently and effectively (when working correctly) manage the flow of fuel from the fuel tank to the engine in order to maintain operability and prevent engine stalling. The fuel delivery system is one of the most basic safety features in every modern car because it controls speed and keeps the engine running unless and until an operator wants to turn the engine off. If the fuel delivery system in a car is defective, then the car is unsafe to operate because it will not predictably respond to operator input to accelerate and it could stall or completely lose power while in motion. Subaru of America, Inc., and Subaru Corporation ("Subaru") have sold and marketed the Affected Vehicles defined below with defective low-pressure fuel pumps that cause unpredictable acceleration and engine stalls and render the Affected Vehicles unsafe to operate.

2.    This lawsuit arises because Subaru knew that the low-pressure fuel pumps in the vehicles identified as "Affected Vehicles" below contained a defect that causes systemic fuel system failures. Yet Subaru refuses to timely repair or replace such defective systems and continues to sell—and require its customers to drive—its vehicles with the defective fuel delivery system, which could result in injuries or even deaths that could otherwise be avoided.

3.    Affected Vehicles include all Subaru models that use the Denso low-pressure fuel pumps and fuel pump assemblies, including pumps that begin with part number prefix 42022-. On April 16, 2020, Subaru initiated a safety recall in the United States concerning the defective

low-pressure fuel pumps (the "Safety Recall Report") to NHTSA voluntarily recalling over

188,000 Subaru vehicles.[1] That recall covered the following Model Year 2019 vehicles

(collectively, the "Recalled Vehicles"):

- Subaru Impreza

- Subaru Outback

- Subaru Legacy

- Subaru Ascent

4.     The Safety Recall Report identified a dangerous defect in the low-pressure fuel

pump, which can fail and cause the Affected Vehicles to unexpectedly stall, sputter, and cause

engine shutdown. According to the Safety Recall Report: "If the low pressure fuel pump

becomes inoperative, the check engine warning light or malfunction indicator light may

illuminate, and/or the engine may run rough. In the worst case, an inoperative fuel pump may

result in the ***engine stalling without the ability to restart the vehicle, increasing the risk of a***

***crash***."[2]

5.     The Safety Recall Report expanded on the nature of the defect of the low-pressure

pump:[3]

> The affected vehicles may be equipped with a low pressure fuel
> pump produced during a specific timeframe which includes an
> impeller that was manufactured with a lower density. If the surface
> of the lower density impeller is exposed to solvent drying for
> longer periods of time, it may develop fine cracks. Those cracks
> may lead to excessive fuel absorption, resulting in impeller
> deformation. Over time, the impeller may become deformed

---

[1] A true and correct copy of the Safety Recall Report is attached as Exhibit A to this
Complaint.

[2] *Id.* at 5–6.

[3] *Id.* at 5.

enough to interfere with the body of the fuel pump, potentially
causing the low pressure fuel pump to become inoperative.

6.      On information and belief, the Recalled Vehicles are just the tip of the iceberg.

Based on complaints to the National Highway Traffic Safety Administration ("NHTSA"), this

defect has existed in Subaru vehicles since at least 2013, and continues to the present day. Just

three months ago—in April 2020—a driver reported that "when driving my vehicle around 50-70

it will hesitate and acts like it wants to stop. No warning lights come on[.]"[4]

7.      The Fuel Pump Defect endangers drivers, passengers, and other persons and

property in the vicinity of an Affected Vehicle at any time that it is in motion. The Fuel Pump

Defect thus renders the Affected Vehicles less safe and less valuable than consumers would

reasonably expect and it makes them less safe and less valuable than the Affected Vehicles

would be if Subaru did not design and sell the Affected Vehicles with the Fuel Pump Defect.

8.      Plaintiffs accordingly bring this class action complaint to recover on behalf of the

Class all relief to which they are entitled, including but not limited to recovery of the purchase

price of their vehicles, compensation for overpayment and diminution in the value of their

vehicles, out-of-pocket and incidental expenses, and an injunction compelling Subaru to replace

or recall and fix the Affected Vehicles.

## II.      PARTIES

### A.      Plaintiffs

9.      Plaintiffs and each and every Class member have suffered an ascertainable loss as

a result of Subaru's omissions and/or misrepresentations associated with the Affected Vehicles,

including but not limited to out-of-pocket loss and diminished value of the Affected Vehicles.

---

[4] NHTSA Complaint 11321843.

10.     Neither Subaru, nor any of its agents, dealers, or other representatives, informed Plaintiffs or Class members of the Fuel Pump Defect in the Affected Vehicles prior to purchase.

11.     Plaintiffs received information about the characteristics, benefits, safety, and quality of the Affected Vehicles at the dealership and/or through Subaru's extensive advertising concerning quality and safety, as intended by Subaru. None of the information Plaintiff received disclosed the Fuel Pump Defect prior to the vehicle's purchase.

**1.      Plaintiff Gilles Cohen**

12.     Plaintiff Gilles Cohen is a resident of the State of Florida, domiciled in North Miami, Florida. On or about September 19, 2019, Plaintiff entered into a three-year lease agreement for a 2019 Subaru Impreza (for the purpose of this section, the "Affected Vehicle") from Lehman Subaru Miami (an authorized Subaru dealership) in North Miami, Florida.

13.     Unknown to Plaintiff at the time the Affected Vehicle was leased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Subaru's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

14.     Plaintiff uses the Affected Vehicle for personal and family uses. Prior to leasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Subaru placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to lease the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

15.     Subaru never told Plaintiff about the Fuel Pump Defect, so Plaintiff leased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Subaru vehicle because he believed Subaru's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Subaru would be unable to repair the defect. Had Subaru disclosed the Fuel Pump Defect, and the fact that Subaru would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have leased the Affected Vehicle or would have paid less for it.

### 2.     Plaintiff John Micklo

16.     Plaintiff John Micklo is a resident of the State of Minnesota, domiciled in Northfield, Minnesota. On or about August 8, 2018, Plaintiff purchased a 2019 Subaru Ascent (for the purpose of this section, the "Affected Vehicle") from Bloomington Acura/Subaru (an authorized Subaru dealership) in Bloomington, Minnesota.

17.     Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Subaru's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

18.     Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Subaru placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the

price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

19.     Subaru never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Subaru vehicle because he believed Subaru's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Subaru would be unable to repair the defect. Had Subaru disclosed the Fuel Pump Defect, and the fact that Subaru would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

**B.     Defendants**

**1.     Subaru Corporation**

20.     Defendant Subaru Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan, in the Shibuya province.

21.     Subaru Corporation has purposefully availed itself of this jurisdiction by designing, manufacturing, marketing, distributing, and selling the Affected Vehicles in New Jersey and throughout the United States.

- 6 -

**2.      Subaru of America, Inc.**

22.     Defendant Subaru of America, Inc. is a New Jersey corporation with its principal place of business in Camden, New Jersey.

23.     Subaru of America, Inc., a wholly owned subsidiary of Subaru Corporation, serves as Subaru Corporation's sales and marketing agent in the United States. Subaru of America, Inc., is responsible for marketing, selling, distributing, and servicing the Affected Vehicles in the United States.

24.     In this Complaint, when reference is made to any act, deed or conduct of either defendant or, collectively, "Subaru," the allegation means that the defendant engaged in the act, deed or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the defendant.

25.     Subaru sells cars in part via communications that it authorized its dealers to make about Subaru vehicles, including the Defective Vehicles discussed herein. This includes authorizing Subaru dealers to distribute brochures and other marketing and promotional material. Subaru, through its authorized dealers, has had the opportunity to disclose all material facts relating to the Defective Vehicles.

26.     Authorized Subaru dealers are Subaru's agents, such that an opportunity to receive information from an authorized Subaru dealership is an opportunity to receive information directly from Subaru itself. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015). This agency relationship is established by the fact that, among other things: Subaru's logo is displayed at authorized dealerships; Subaru issues technical bulletins and service instructions to dealerships detailing potential vehicle problems, and also relies on them to push software updates to customers' vehicles; Subaru distributes various advertising and promotional

material to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express warranty, Subaru requires its customers to return to its authorized dealerships to perform warranty repairs.[5]

### III.    JURISDICTION

27.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

28.    This Court has personal jurisdiction over Subaru by virtue of its transacting and doing business in this District, including locating and operating its headquarters in Camden, New Jersey, in this District. Subaru has purposefully availed itself of the benefits and protections of the District of New Jersey by continuously and systematically conducting substantial business in this judicial district. Subaru has intentionally and purposefully sold, supplied, and distributed Affected Vehicles into the stream of commerce within New Jersey and throughout the United States.

29.    This Court has personal jurisdiction over Subaru by virtue of its transacting and doing business in this District, including locating and operating its headquarters in this District.

---

[5] *See* 2019 Warranty, available at https://www.subaru.com/owners/vehicle-resources/manuals.html?modelCode=2019-ASC-KCA (last visited July 7, 2020). The 2019 Warranty states that "[a]ny and all repairs must be performed by an Authorized SUBARU Retailer located in the United States."

## IV.    VENUE

30.    Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Subaru licenses authorized dealers in this District, it advertises in this District, and it profits from its activities conducted within this District.

## V.    FACTUAL ALLEGATIONS

### A.    Subaru's History of Defective Fuel Delivery Systems

31.    Subaru sources many of the electrical components in its vehicles from Denso Corporation, a Japanese auto parts supplier. As early as 2015, Denso had recognized that the low-pressure fuel pumps that it supplied to Subaru and other manufacturers were prone to failure. In a patent application filed in 2016, Denso admitted that the composite (plastic) impellers in its low-pressure fuel pumps "may be swelled due to the fuel and water contained in the fuel, [and] therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the [fuel pump] housing."[6] The defect described by the patent application is virtually the same as the Fuel Pump Defect at the heart of this case.

32.    Subaru has admitted knowing about the Fuel Pump Defect as early as July 2019, when it claimed that it first began receiving field reports of the defective pump, including the vehicles' no-start condition and sudden stalls while driving.[7] Subaru also admitted that, in January 2020, sudden shutdown also occurred at highway speeds. Based on its investigation, "Subaru found that the impeller was deformed and was likely the cause of the loss of power."[8]

___

[6] U.S. Patent Application No. 15767375, *Impeller for Fuel Pump* (Oct. 26, 2016) (applicants Denso Corporation, et al.), available at https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533 (last visited July 7, 2020).

[7] Exhibit A at 7.

[8] *Id.* at 7.

33.     On information and belief, even the vehicles subjected to the 2020 recall do not capture all of the Affected Vehicles. It does not include all of the Subaru vehicles that were equipped with Denso low-pressure fuel pumps and fuel pump assemblies, including parts that begin with part number prefix 42022-, the single common part in every model that Subaru has recalled for the admitted fuel delivery system defect.

**B.     Subaru Has Not Remedied the Fuel Pump Defect in Affected Vehicles**

34.     The Fuel Pump Defect in the Affected Vehicles is dangerous to drivers, vehicle occupants, and innocent bystanders. A vehicle that fails to accelerate when demanded, or stalls while in motion, is simply unsafe to operate.

35.     Subaru has not fixed the Recalled Vehicles, or any other Affected Vehicles, despite its admission of the existing safety defect relating to the low-pressure fuel pump. Upon information and belief, and based on Subaru's website dedicated to recalls, a substantial number of the Recalled Vehicles—across all four of the Affected Vehicles—have not even been recalled yet, leaving vehicle owners without the means to repair the pump or even the knowledge that this dangerous defect exists.

36.     Rather than spend the money necessary to address the defect, or at least warn its customers that they have cars equipped with faulty fuel pumps, Subaru has shifted the significant and serious risk of inoperable vehicles, accidents, injury, and even death onto its customers.

37.     Subaru has not recommended or advised that consumers stop driving Affected Vehicles pending repair or replacement of the Fuel Pump Defect. Even though it knows and admits that the Fuel Pump Defect could cause high-speed stalls and other dangerous conditions, Subaru is unwilling to spend the money necessary to provide alternative transportation to its customers. Instead, it makes them choose between driving a car with a known dangerous defect or driving nothing at all. On information and belief, most owners of Affected Vehicles have no

- 10

idea that the low-pressure fuel pumps in their supposedly safe and reliable Subaru vehicles have a known safety defect and have been the subject of a massive recall. To this day, Subaru has not notified a substantial number of them of the 2020 safety recall.

**C.    NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks**

38.    Affected Vehicle owner complaints to NHTSA describe harrowing traffic events and near misses, making perfectly clear that this is not a defect that Subaru can continue to ignore.

**1.    Pre-2019 Vehicles with the Defective Pump**

39.    These complaints go back several years, further demonstrating both Subaru's knowledge of the defect and that the defect affects more vehicles than those recalled by Subaru. For example, on January 17, 2017, a 2013 Subaru Outback owner reported to NHTSA as follows:[9]

> ON MULTIPLE OCCASIONS, THE VEHICLE STALLED, AS IN THE ENGINE DIED. THIS IS AN INTERMITTENT PROBLEM. USUALLY IT HAPPENS WHEN THE VEHICLE IS STARTED, THE ENGINE WILL DIE, THIS WILL HAPPEN 2-3 TIMES ON EACH OCCURRENCE. IT DOES EVENTUALLY START AND RUN CORRECTLY. A SIMILAR ISSUE OCCURS WHEN COMING TO A STOP. THE ENGINE WILL "FLUTTER" ALMOST DIE AND THEN RESUME NORMAL OPERATION. SO FAR IT HAS NOT LEFT US STRANDED, HOWEVER, I AM CONCERNED AS TO WHAT THE PROBLEM MIGHT BE AND AT WHAT POINT WILL IT STALL AND NOT START AGAIN. I PLAN ON TAKING IT TO MY DEALERSHIP AND HAVE THEM LOOK AT IT, HOWEVER, THE ENGINE LIGHT HAS NOT COME ON SO I DON'T EXPECT THE COMPUTER HAS STORED ANY CODES FOR THE MECHANIC TO BE ABLE TO TROUBLESHOOT.

---

[9] NHTSA Complaint 10945876. All NHTSA complaints and reports are copied and pasted as-is; all emphases added.

40.     On April 17, 2017, a 2013 Subaru Outback owner reported to NHTSA as

follows:[10]

> ISSUE: OCCASIONAL NON-RESPONSE WHEN
> DEPRESSING THE ACCELERATOR.
>
> 1ST OCCURRENCE ABOUT THREE WEEKS AGO HAPPEN
> WHEN I STOPPED FOR A LIGHT AND THEN ATTEMPTED
> TO ACCELERATE. DEPRESSING THE PEDAL HAS NO
> RESPONSE, ATTEMPTED THIS THREE TIMES. THE RPM
> GAUGE REFLECTED IT WAS RUNNING. I TURNED ON THE
> CAR AND STARTED IT AGAIN AND IT WORKED.
>
> 2ND OCCURRENCE HAPPENED AGAIN AFTER A STOP.
> SAME AS ABOVE.
>
> 3RD OCCURRENCE MAY 6 2017 RETURNING FROM BWI
> IN BALTIMORE ON THE INTERSTATE, I WAS IN HEAVY
> TRAFFIC. I HAD TO SLOW QUICKLY FOR A TRUCK AND
> THEN SAW AN OPENING IN THE LEFT LANE AND
> PULLED OUT INTO THE LEFT LANE AND ATTEMPTED TO
> ACCELERATE WITH NO RESPONSE. *A CAR MOVING FAST
> IN THE LEFT LANE ALMOST HIT ME SINCE I COULD
> NOT ACCELERATE.* I PUMPED THE ACCELERATOR
> TWICE AND IT THEN ACCELERATED.
>
> 4TH OCCURRENCE MAY 6TH 2017 DEPARTING A
> PARKING LOT I WAS MOVING SLOWLY THEN
> ATTEMPTED TO ACCELERATE AND EXPERIENCED A
> DELAYED RESPONSE. PUMPED THE PEDAL TWICE TO
> GET THE RESPONSE.
>
> WENT TO A SUBARU DEALER AFTER THE FIRST TWO
> OCCURRENCES AND THEY SAID THEY COULD NOT
> IDENTIFY THE PROBLEM. THE DEALER CALLED AGAIN
> AND REQUESTED WE BRING THE CAR IN AGAIN APRIL
> 11TH.
>
> A WEB SEARCH REVEALED ABOUT 24 OTHIS LIKE
> OCCURRENCES WITH OUTBACK ABOUT THE SAME
> YEAR AND MAKE.

---

[10] NHTSA Complaint 10971205.

41.     On March 8, 2013, a 2013 Subaru Impreza owner reported to NHTSA as

follows:[11]

> VEHICLE WILL NOT START AFTER AN EXTENDED
> PERIOD OF ATTEMPTS. APPEARS TO HAPPEN MOST
> OFTEN WHEN VEHICLE IS PARKED (EITHIS INDOORS OR
> OUTSIDE) FOR MORE THAN SEVERAL HOURS. CAR WILL
> CRANK OVER FOR 10+ SECONDS AND WILL NOT START.
> AFTER MULTIPLE ATTEMPTS, CAR HAS STARTED
> EVENTUALLY.
>
> HAVE COMMUNICATED WITH DEALER AND SIA OFFICES
> THAT I HAVE NOTICED THE CAR WILL MAKE WHIRRING
> NOISES THAT COME FROM THE BACK RH SIDE OF
> VEHICLE - AND ALSO A CLICKING NOISE NEAR CENTER
> OF DASH WHEN TURNED OFF AND SITTING. THIS WILL
> GO ON FOR OVER 5 MINUTES AT A TIME, WHICH MUST
> DRAIN BATTERY SINCE CAR IS NOT TURNED ON OR
> ENGINE RUNNING. WAS TOLD BY DEALER THAT THIS IS
> THE EMISSION SYSTEM "PURGING" ITSELF - AND IS
> CONSIDERED NORMAL FOR THIS VEHICLE. SIA OFFICES
> CONFIRMED THIS AND ALSO STATED THAT NOTHING IS
> NOTED IN THE CURRENT OWNERS MANUAL WHICH
> EXPLAINS THIS FEATURE.
>
> MY CONCERN IS THAT THE CAR IS UNABLE TO START
> WHEN REQUIRED TO - AND AM GUESSING THAT IT
> MIGHT BE RELATED TO THIS UNUSUAL FEATURE... .
> REGARDLESS OF ORIGIN, SAFETY ISSUE WITH CAR NOT
> STARTING AND BEING READY TO OPERATE WHEN
> NORMAL STARTING PROCEDURES ARE FOLLOWED.

42.     On January 25, 2017, a 2013 Subaru Legacy owner reported to NHTSA as

follows:[12]

> THE CAR INTERMITTENTLY LOSES POWER WHEN
> ACCELERATING FROM A STOPPED POSITION. MOST
> OFTEN HAPPENS WHEN I AM TURNING LEFT. SUBARU
> SAYS THISE ARE NO COMPUTER CODES IN THE CHECK
> ENGINE HISTORY. CAUSE UNKNOWN BUT SPECULATION
> ADVANCED ABOUT NEURAL NETWORK LEARNING OF

---

[11] NHTSA Complaint 10502043.

[12] NHTSA Complaint 10947694.

THE COMPUTER (SEEMS WORST AFTER RECENT ENGINE REBUILD UNTIL CAR WAS DRIVEN FOR A COUPLE OF DAYS WHISE FREQUENCY OF POWER LOSS DIMINISHED BUT NOT GO AWAY). . . . FULL GAS TANK VS 1/2 OR LESS , FUEL STARVATION CAUSES POWER DROP (NOTE: ENGINE DOESN'T FULLY DIE & CAN BE COAXED BACK TO LIFE BY PUMPING THE ACCELERATOR), ELECTRONIC IGNITION SYSTEM PERHAPS THE CULPRIT. ***THIS PROBLEM IS DANGEROUS BECAUSE OF THE RANDOM & SUDDEN (WITHOUT WARNING) LOSS OF POWER WHICH ANY DRIVER IMMEDIATELY BEHIND MY CAR WOULD NOT BE EXPECTING & THISEBY CAUSE A REAR-END COLLISION. ALSO, DANGEROUS WHEN ENTERING A LANE OF TRAFFIC & SUDDENLY THE POWER IS GONE JUST WHEN YOU NEED ACCELERATION IN ORDER TO MERGE AT TRAFFIC SPEED INTO YOUR LANE***. SOMETIMES PROBLEM OCCURS WHEN GOING UP A LOW ANGLE INCLINE (EST. 10-15 DEGREES?) BUT NOT NECESSARILY. WHEN LEAVING A STOPPED POSITION, IF LEFT FOOT IS ON THE BRAKE & RIGHT IS SLIGHTLY ACCELERATING IN ORDER TO PULL AWAY MORE RAPIDLY FROM STOPPED POSITION, THE CONTROLLING COMPUTER WILL SOMETIMES PROVIDE ZERO POWER TO THE ACCELERATOR BUT THIS HAPPENS ONLY OCCASIONALLY & OFTEN WILL WORK JUST FINE TO GIVE THE EXTRA ACCELERATION NEEDED. SUBARU SAYS THIS CONFUSES THEIR COMPUTER & IT WILL SHUT DOWN BUT I HAVE FOUND THAT THIS HAPPENS ABOUT 1/3 OF THE TIME, IN MY EXPERIENCE. DANGER COMES FROM LOSING POWER DURING THE TIME YOU NEED IT THE MOST ESP. LEFT TURNS WHICH CROSS TRAFFIC LANES BEFORE YOU CAN MERGE AND DRIVING COMPLETELY NORMALLY.

43.     On March 15, 2020, a 2014 Subaru Outback owner reported to NHTSA as

follows:[13]

DELAYED GAS PEDAL RESPONSE=HESITATION TO ACCELERATE WHEN GAS PEDAL ENGAGED FROM A STATIONARY STOP. I HAVE EXPERIENCED THIS FAILURE TO ACCELERATE THE VEHICLE FROM A STOPPED

---

[13] NHTSA Complaint 11318118.

POSITION IN EXCESS OF 25 TIMES OVER A MORE THAN 5 YEAR PERIOD.

THE SUBARU IS NOT MINE BUT A RELATIVES CAR. IN EARLY FEBRUARY 2019, I WAS STOPPED AT A LIGHT ATTEMPTING TO MAKE A LEFT HAND TURN.

TRAFFIC COMING AT ME WAS UP A HILL WITH A GRADE OF 6% OR MORE WHICH LIMITED THE LINE OF SIGHT FOR SOMEONE WANTING TO MAKE A LEFT HAND TURN AT THAT INTERSECTION. AS I STEPPED ON THE GAS TO MAKE THE TURN THISE WAS NO RESPONSE FROM THE CAR. THE CAR COMING UP THE HILL WAS UPON ME. I PUMPED THE GAS SEVERAL TIMES AND LUCKILY WAS ABLE TO MAKE IT THROUGH THE *INTERSECTION. **MY WIFE AND I WERE INCHES AWAY FROM BEING WACKED BY THE OTHIS CAR.** THE CAR APPROACHING HAS A SPEED LIMIT OF 45 MPH BUT WAS MOST LIKELY TRAVELING IN EXCESS OF 45 MPH. ONCE THROUGH THE INTERSECTION, WE PULLED TO THE CURB TO GATHIS OURSELVES.

THAT'S WHEN I SAID ENOUGH IS ENOUGH AND SENT TWO LETTERS TO TOM DOLL OF SUBARU. ONE IN FEBRUARY & APRIL 2019. HE OF COURSE PASS IT ON TO CSERVICE. THE INDIVIDUAL WROTE BACK SAYING NOTHING IS WRONG.

I AM A PROFESSIONAL ENGINEER AND HAVE BEEN FOR MANY YEARS. I POINTED OUT ALL ENGINEERS INCLUDING AUTOMOTIVE ENGINEERS MUST ADHISE TO A CODE OF ETHICS & ADHISE TO THE "HIGHEST STANDARDS OF HONESTY AND INTEGRITY, AND MUST BE DEDICATED TO THE PROTECTION OF THE PUBLIC HEALTH, SAFETY AND WELFARE AND MUST ADHISE TO THE HIGHEST

PRINCIPLES OF ETHICAL CONDUCT." THAT MEANT NOTHING TO SUBARU.

CLEARLY FROM MY EXPERIENCE THISE IS A PROBLEM WITH THE 2014 SUBARU OUTBACK AND IT'S RANDOM FAILURE TO ACCELERATE DUE TO A DELAYED GAS PEDAL RESPONSE.

44.    On February 3, 2019, a 2014 Subaru Outback owner reported to NHTSA as

follows:[14]

> 3 TO 15 SECOND HESITATION IN THROTTLE RESPONSE. *LAST INCIDENT NEARLY RESULTED IN A COLLISION. I STOPPED WAITING FOR TRAFFIC TO CLEAR BEFORE MAKING AN LEFT TURN*. MADE THE LEFT TURN, GENTLY APPLIED THE THROTTLE PEDAL, NO RESPONSE, PUSHED IT TO MAXIMUM TRAVEL, STILL NO RESPONSE, CAR COMING TOWARD ME IN ONCOMING LANE, THEN MY CAR SUDDENLY ACCELERATED SO THAT A COLLISION WAS AVOIDED. CITY 2 LANE STREET, TURNING LEFT.

45.    On August 17, 2017, a 2014 Subaru Outback owner reported to NHTSA as

follows:[15]

> ACCELERATION FROM A STOP OR SLOW SPEED TAKES 5-6 SECONDS FOR A PROPER RESPONSE. *TURNING LEFT IS A VERY REAL PROBLEM OR PULLING INTO ON COMING TRAFFIC. I HAVE YET TO HAVE AN ACCIDENT BECAUSE I AM EXTREMELY CAREFUL, BUT HAVE COME FRIGHTINGLY CLOSE A FEW TIMES*. CAN THIS PROBLEM BEFIXED?
>
> THIS HAPPENS WHEN THE VEHICLE IS STATIONARY, TURNING,BRAKING (SLOWING DOWN AND THEN TRYING TO GO BACK TO NORMAL SPEED. THIS HAPPENS ON INTERSTATES, AROUND TOWN, ETC

46.    On April 24, 2017, a 2015 Subaru Outback owner reported to NHTSA as

follows:[16]

> AT TIMES WHEN YOU PRESS THE ACCELERATOR FROM A STOP IT TAKES 5 OR 6 SECONDS TO RESPOND.I WAS PULLING ON TO THE HIGHWAY TURNING LEFT.*THIS COULD BE A VERY DANGEROUS OR EVEN FATAL INCIDENT IF THISE WAS ONCOMING TRAFFIC.READING FROM THE INTRNET I SEE THAT*

---

[14] NHTSA Complaint 11318118.

[15] NHTSA Complaint 11015970.

[16] NHTSA Complaint 10980329.

*THIS HAS BEEN A PROBLEM AS FAR BACK AS 2013.SOMEONE NEEDS TO FIX THIS PROBLEM BEFORE SOMEONE DIES*.

47.     On May 20, 2015, the owner of a 2014 Subaru Outback filed the following

complaint with NHTSA:[17]

> VEHICLE HESITATES OCCASIONALLY ON
> ACCELERATION COMING OFF A STOP.

48.     On October 24, 2014, the owner of both a 2014 Subaru Legacy and a 2013 Subaru

Impreza reported to NHTSA as follows:[18]

> VEHICLE HAD A 2-5 SECONDS ACCELERATION
> HESITATION. TAKING OFF FROM A YIELD SIGN AND
> GOING ACROSS A HWY, THE CAR HAD ENOUGH POWER
> TO ROLL FORWARD. TRIED FLOORING THE
> ACCELERATOR, BUT ALSO DID NOT RESPOND TO FULL
> THROTTLE UNTIL AFTER A FEW SECONDS THE CAR
> STARTED TO SLOWLY MOVE. THE ENGINE IS ON LOW
> RPMS AND DOES NOT LAUNCH FORWARD AS TO
> INDICATE A TRANSMISSION ISSUE IT LOOKS MORE LIKE
> A FUEL DELIVERY OR THROTTLE SENSOR ISSUE.
>
> I ALSO HAD THIS SAME ISSUE WITH A 2013 SUBARU
> IMPREZA (TRADED IN THE IMPREZA THINKING IT WAS A
> QUIRK WITH THE CAR). SUBARU DEALER WAS NOT
> BEEN ABLE TO REPRODUCE THE ISSUE ON THE IMPREZA
> OR THE ON THE LEGACY. NO ERROR CODES PRESENT.
>
> I CONTACTED SUBARU OF AMERICA, I WAS
> INSTRUCTED TO TAKE THE CAR (LEGACY) TO THE
> DEALER. THE TECHNICIAN WAS NOT ASKED TO ATTACH
> ANY KIND OF DIAGNOSTIC EQUIPMENT TO POSSIBLY
> CAPTURE VALUABLE DATA IN THE EVENT THAT THE
> ISSUE WAS REPRODUCED. WHEN THE PROBLEM HAS
> MANIFESTED, I HAVE ACCELERATED FROM A
> COMPLETE STOP OR FROM A SLOW ROLLING YIELD,
> THEN 2 - 5 SECOND DELAY IN ACCELERATION - VERY

---

[17] NHTSA Complaint 10717533.

[18] NHTSA Complaint 10649644.

SLOW ROLL FORWARD. I SHARED THIS INFORMATION WITH THE DEALER.

***MY FAMILY AND I ALMOST GOT HIT A FEW WEEKS AGO BY A CAR GOING AROUND 60 MPH AND I WAS ALMOST HIT WHEN DRIVING THE IMPREZA (LET THE CAR ROLL BACK TO AVOID BEING HIT - I WAS ON SMALL INCLINE LEAVING MY NEIGHBORHOOD AND TRYING TO MERGE ONTO A HWY)***.

MANY SUBARU OWNERS ARE HAVING THE SAME ISSUE (OLD / NEW VEHICLES). ***THISE ARE SOME BLOGS WHISE CUSTOMERS MENTION HAVING BEEN IN AN ACCIDENT BECAUSE OF THIS ISSUE*** AND PLENTY OF BLOGS WHISE CUSTOMERS REPORT THE PROBLEM AND FRUSTRATION WHEN THE PROBLEM CANNOT BE REPRODUCED AND ARE SENT HOME WITHOUT A FIX.

HOW CAN SAFERCAR.GOV HELP COMMUNICATE THE IMPORTANCE OF THE ISSUE TO SUBARU BEFORE A FATALITY?

49. On November 15, 2014, a 2014 Subaru Legacy owner reported to NHTSA as follows:[19]

I PURCHASED MY BRAND NEW 2014 SUBARU LEGACY ON MAY 16TH 2014. ABOUT ONE WEEK LATER I WAS DRIVING UP THE SLIGHT INCLINE OF THE DRIVEWAY OF THE APARTMENT HOUSE WHISE I LIVE. AS I REACHED THE STREET I STEPPED ON THE ACCELERATOR TO TURN OUT INTO THE TRAFFIC AND THE CAR COMPLETELY LOST POWER. ABOUT 5 SECONDS LATER THE POWER RETURNED AND THE CAR RESPONDED NORMALLY WHEN I STEPPED ON THE ACCELERATOR PEDAL AND I WAS ABLE TO DRIVE THE CAR NORMALLY. THREE OR FOUR DAYS LATER THE SAME THING HAPPENED AGAIN WHILE I WAS DRIVING IN TRAFFIC, AS I TRIED TO ACCELERATE THE CAR'S ENGINE LOST POWER WHEN I STEPPED ON THE ACCELERATOR. THIS SAME LOSS OF POWER NOW HAPPENS ABOUT TWO OR THREE TIMES EACH WEEK. I CURRENTLY HAVE ABOUT 2500 MILES ON THE CAR. I HAVE TAKEN IT TO MY LOCAL SUBARU DEALERSHIP ON THREE SEPARATE OCCASIONS FOR THIS COMPLAINT AND THEY HAVE KEPT THE CAR FOR A

[19] NHTSA Complaint 10655186.

TOTAL OF ABOUT THIRTY DAY FOR OBSERVATION,
TESTING, AND REPAIR BUT THEY HAVE BEEN UNABLE
TO REPRODUCE OR SOLVE THE PROBLEM AND CAN FIND
NOTHING WRONG WITH MY CAR. THEY WARNED ME
ABOUT DRIVING WITH TWO FEET BECAUSE IF THE
BRAKE IS APPLIED AT THE SAME TIME AS THE
ACCELERATOR A PROBLEM LIKE THIS COULD OCCUR
BUT I DO NOT DRIVE USING BOTH FEET AND HAVE
ALWAYS DRIVEN USING ONLY ONE FOOT.

50.   On August 12, 2017, a 2015 Subaru Outback owner reported to NHTSA as

follows:[20]

GAS PEDAL SENSOR DOSE NOT RESPOND ON TAKE OFF
FROM STOPPED VEHICLE. ***HAVE ALMOST BEEN T-BONE
5-6 TIMES***. ALSO FROM A COST TO PUTTING PRESSURE
ON PEDAL IT FAILS TO RESPOND. ON LEFT TURNS YOU
ARE A SITTING DUCK NOT KNOWING IF PEDAL WILL
RESPOND OR YOU ARE SITTING OUT IN FRONT OF SOME
CLOSING IN ON YOU AT HIGH RATE SPEED THIS HAS
HAPPENED 10 -12 TIMES ON HIGHWAYS AN CITY
STREETS

51.   On April 6, 2020, a 2015 Subaru Outback owner reported to NHTSA as

follows:[21]

TL* THE CONTACT OWNS A 2015 SUBARU OUTBACK .
THE CONTACT STATED THAT THE VEHICLE FAILED TO
START. THISE WERE NO WARNING LIGHTS
ILLUMINATED. THE LOCAL DEALER WAS NOT
CONTACTED. THE MANUFACTURER WAS CONTACTED
BUT NO FURTHIS ASSISTANCE WAS PROVIDED. THE
FAILURE MILEAGE WAS 69,000.

52.   On February 12, 2019, a 2015 Subaru Outback owner reported to NHTSA as

follows:[22]

THE CAR WOULD STALL WHEN COASTING TO A STOP
LIGHT OR STOP SIGN A FEW TIMES AND HAVE BEEN

---

[20] NHTSA Complaint 11014803.

[21] NHTSA Complaint 11320331.

[22] NHTSA Complaint 11176539.

BACK TO THE DEALER AND CAN'T REPLICATED THE
PROBLEM. ***THIS IS A DANGEROUS SITUATION AND CAN
CAUSE AN UNSAFE AND HUGE ACCIDENT WITH MY
FAMILY. THE CAR WOULD DIE WHILE IN DRIVE AND
SOMETIMES CAN'T BE RESTARTED***. IT'S HAPPENING
AGAIN AND AFRAID TO DRIVE THE CAR SINCE THE
DEALER WILL SAY NOTHING IS WRONG WITH THE CAR.
IT LOOKS LIKE IT'S RELATED TO IDLE BEING LOW OR
THE CVT ACTING UP WHEN TAKING THE FOOT OFF THE
GAS PEDAL AND TRY TO ACCELERATE FROM A DEAD
STOP OR COASTING TO A STOP. THIS HAPPENED A FEW
TIMES DURING FACTORY WARRANTY WINDOW.

53.    On May 27, 2016, a 2015 Subaru Impreza owner reported to NHTSA as

follows:[23]

CAR WILL HAVE A SLOW OR NON RESPONSIVE START
FROM A STOP.. THISE WILL BE A COUPLE SECOND LAG
FROM THE TIME I PRESS ON THE ACCELERATOR.

54.    On January 2, 2019, the owner of a 2016 Subaru Outback filed the following

complaint with NHTSA:[24]

ON TWO OCCASIONS WHILE DRIVING ON THE
INTERSTATE AT 65-75 MPH WITH NO WARNING THE GAS
PEDAL STOPPED RESPONDING TO INPUTS. WHILE
MANEUVERING THE VEHICLE TO THE SHOULDER OF
THE ROAD THROUGH TRAFFIC THE ENGINE SHUTOFF.
ON ONE OCCASION I WAS ABLE TO RESTART THE
VEHICLE AND ON THE SECOND OCCASION IT WOULD
NOT RESTART. AFTER TOWING THE VEHICLE TO A
REPAIR SHOP THE VEHICLE STARTED UP AND RAN WITH
NO ISSUES. NO CHECK ENGINE LIGHTS WERE EVER
DISPLAYED. THE BATTERY WAS WORKING FINE AND
FULLY CHARGED. THE CAR IS IN PERFECT MECHANICAL
SHAPE WITH ALL REGULAR SERVICE PERFORMED. THE
GAS REMAINING AT TIME OF INCIDENT WAS
APPROXIMATELY 1/4 TANK FULL. THE CAUSE IS
UNKNOWN TO ME.

---

[23] NHTSA Complaint 10871184.

[24] NHTSA Complaint 11164684.

55.     On July 13, 2018, a 2016 Subaru Outback owner reported to NHTSA as

follows:[25]

> AFTER STOPPING AT A STOP SIGN ON A CITY STREET, I
> TRIED TO ACCELERATE BUT THISE WAS A LONG
> HESITATION FOLLOWED BY A SURGE OF POWER. THIS
> HAPPENED ON 2 OCCASIONS. I HAD THE SALES MAN
> DRIVE THE VEHICLE AND ALSO THE SERVICE MANAGER
> DROVE IT FOR 1 WEEK - NEITHIS TIMES DID THIS ISSUE
> REPEAT ITSELF. THE DEALERSHIP DID NOT HAVE ANY
> KNOWLEDGE OF THIS TYPE OF PROBLEM. I REFUSED TO
> DRIVE THIS VEHICLE AND RETURNED IT TO THE
> SUBARU DEALER IN BERLIN, CT.

56.     On January 29, 2020, a 2017 Subaru Outback owner reported to NHTSA as

follows:[26]

> CAR LOST POWER AND ENGINE SHUT DOWN WHILE AT
> FREEWAY SPEED WITH 1/8 TANK APPARENT REMAINING
> ON THE GAS GAUGE AND 60 MILES REMAINING ON THE
> MILES TO GO INDICATOR. ADDED 1 GALLON AT
> ROADSIDE AND CAR STARTED IMMEDIATELY. ADDED
> AN ADDITIONAL 15.5 GALLONS AT A STATION 12 MILES
> FROM POINT THE ENGINE SHUT DOWN. THIS LEAVES
> BETWEEN 2 AND 2.5 GALLONS OF UNUSED FUEL IN THE
> TANK AT THE POINT THE CAR SHUT DOWN FROM FUEL
> STARVATION.

57.     On October 30, 2019, a 2017 Subaru Outback owner reported to NHTSA as

follows:[27]

> TL* THE CONTACT OWNS A 2017 SUBARU OUTBACK.
> DURING COLD WEATHIS, THE VEHICLE FAILED TO
> START. THE FAILURE OCCURRED EVER SINCE THE
> VEHICLE WAS PURCHASED ON APRIL 15, 2017. THE
> VEHICLE WAS TAKEN TO CAPITAL SUBARU (920
> CAPITAL EXPRESSWAY AUTO MALL, SAN JOSE, CA
> 95136) ON THREE DIFFERENT OCCASIONS, BUT THEY

---

[25] NHTSA Complaint 11111266.

[26] NHTSA Complaint 11302920.

[27] NHTSA Complaint 11277169.

WERE NOT ABLE TO REPLICATE THE FAILURE. THE
MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE
FAILURE MILEAGE WAS 38,718.

58.    On May 18, 2019, a 2017 Subaru Outback owner reported to NHTSA as

follows:[28]

IN TWO SEPARATE EVENTS THE CAR LOST POWER
WHILE ACCELLORATING AT HIGHWAY SPEEDS TO
MERGE INTO TRAFFIC FROM A STAND STILL. THE GAS
PEDAL BECAME UNRESPONSIVE AND THE
TRANMISSION STOPPED SHIFTING. IN THE FIRST
INCIDENT THE ENGINE STALLED, AND IN THE SECOND
IT SPUTTERED AND ALMOST DIED DURING A HEAVY
MERGE ON AN ON RAMP. NO DIAGNOSTIC CODES WERE
THROWN, SO THE MANUFACTURER CLAIMS THISE IS
NOTHING WRONG WITH THE CAR. IN THE FIRST
INCIDENT THE CAR WAS LEAVING THE TOLL PLAZE ON
THE DULLES GREENWAY HEAD TOWARD LEESBURG,
VA. UNDER FULL ACELLERATION LEAVING THE TOLL
PLAZA AND EFFECTIVELY DRIVING STRAIGHT, THE CAR
STARTED SHUFTING ERRATICALLY, AND EVENTUALLY
LOST POWER AND STALLED. IN THE SECOND INCIDENT,
ABOUT TWO MONTHS LATER, THE CAR WAS ON A
DECLINE ON-RAMP MERGING INTO HEAVY TRAFFIC ON
RT-270N HEADING TOWARD FREDERICK, MD. THE CAR
AGAIN STARTED TO SHIFT ERRATICALLY, THEN BEGAN
TO STALL, BUT I WAS ABKE TO USE THE PADDLE
SHIFTERS TO SHIFT THE "GEAR" OF THE CVT AND
PREVENT STALLING. AFGER ABOUT 30 SECONDS THE
CAR WAS OPERATING AS NORMAL. AGAIN, THE DEALER
HAS NOT FOUND ANY DIAGNOSTIC CODES, AND
INDICATES THISE IS NITHING WRONG WITH THE
VEHICLE.

59.    On November 7, 2019, a 2017 Subaru Impreza owner reported to NHTSA as

follows:[29]

TL* THE CONTACT OWNS A 2017 SUBARU IMPREZA.
WHEN THE CONTACT ATTEMPTED TO ACCELERATE,

[28] NHTSA Complaint 11208473.

[29] NHTSA Complaint 11278649.

THE VEHICLE LOST POWER. THE CONTACT WAS ABLE
TO DRIVE THE VEHICLE TO HIS RESIDENCE. THISE WERE
NO WARNING INDICATORS ILLUMINATED. THE VEHICLE
WAS LATER TAKEN TO HISITAGE SUBARU OWINGS
MILLS (9808 REISTERSTOWN RD, OWINGS MILLS, MD
21117, (888) 553-0026) WHISE THE TECHNICIAN REPLACED
THE BATTERY; HOWEVER, THE FAILURE RECURRED.
THE VEHICLE WAS NOT TAKEN BACK TO THE DEALER
AND WAS NOT REPAIRED. THE VIN WAS INCLUDED IN
NHTSA CAMPAIGN NUMBER: 19V743000 (ELECTRICAL
SYSTEM). THE MANUFACTURER WAS NOT MADE OF THE
FAILURE. THE FAILURE MILEAGE WAS
APPROXIMATELY 9,500.

60.     On January 24, 2018, a 2017 Subaru Impreza owner reported to NHTSA as

follows:[30]

I WAS ABOUT TO MAKE A LEFT TURN AT THE LIGHT
WHEN CAR SUDDENLY STALLED. BROUGHT IT TO
LIBERTY SUBARU DEALERSHIP THE NEXT DAY AND
TECH RELEASE IT AS SAFE TO DRIVE AFTER THEY
CLAIMED TO FIX THE MAIN RELAY. A MINUTE AFTER I
LEFT THE DEALERSHIP CAR STALLED AGAIN NEAR THE
TRAIN TRACKS. *THE 2017 SUBARU IMPREZA IS
HAZARDOUS, UNSAFE, AND LIFE THREATENING*. THIS
TIME LIBERTY SUBARU SAID THEY HAVE TO REWIRE
THE ENGINE. I AM NOT COMFORTABLE DRIVING THIS
CAR WITH MY CHILDREN. IT IS NOT SAFE FOR ME, MY
FAMILY, AND OTHIS DRIVERS.

61.     On April 15, 2019, a 2018 Subaru Outback owner reported to NHTSA as

follows:[31]

WHEN I COME TO A STOP AND WAITING TO MAKE A
LEFT TURN, THE VEHICLE WILL STALL WHEN I START
TO TURN. *ENGINE IS STILL RUNNING, BUT THE CAR
ESSENTIALLY STOPS IN MID TURN. THIS LEAVES ME
EXPOSED TO A BROADSIDE COLLISION*. DEALER DOES
NOT KNOW WHAT IS CAUSING IT AND IT DOES NOT
HAPPEN EVERY TIME. IN THE LAST 1000 MILES IT HAS
OCCURRED 4 TIMES. AFTER THE HESITATION, ABOUT 3 -

---

[30] NHTSA Complaint 11064614.

[31] NHTSA Complaint 11196562.

5 SECONDS, IT STARTS TO MOVE. IT HAS ALSO
OCCURRED WHEN MOVING FROM ONE LANE TO
ANOTHIS AFTER COMING TO A NEAR STOP DUE TO A
CLOSED LANE IN THE ROAD.

62.     On March 16, 2019, a 2018 Subaru Outback owner reported to NHTSA as

follows:[32]

FUEL DELIVERY PROBLEM. SOMETIMES WHEN
STARTING UP FROM A STOP SIGN AND ALL OF A
SUDDEN THISE IS NO POWER AND YOU HAVE TO HIT
THE ACCELERATOR A COUPLE OF TIMES TO GET THE
CAR TO RESPOND. SOMETIMES THIS OCCURS AT LOW
SPEED GOING LEFT AND ALL OF A SUDDEN THISE IS NO
POWER AND YOU HAVE TO HIT THE ACCELERATOR A
COUPLE OF TIMES TO GET IT TO RESPOND. THE ENGINE
NEVER STALLS OUT. ON THE EXPRESSWAY IT DROPPED
OUT OF CRUSE TWICE. I PULLED UP TO A STOP SIGN TO
CROSS INTO TRAFFIC AND IT HAD POWER AT FIRST AND
THEN NO POWER. *I WAS THEN IN A PANIC MODE
PRESSING ON THE ACCELERATOR AND FINALLY IT
RESPONDED. THIS IS WHY I THINK IT IS SERIOUS*.

63.     On February 1, 2019, a 2018 Subaru Outback owner reported to NHTSA as

follows:[33]

I WAS DRIVING THROUGH AN INTERSECTION WHEN THE
ENGINE STALLED WITH 1/8TH OF A TANK OF GAS
REMAINING. GAS LIGHT CAME ON ONLY A FEW MILES
PRIOR. LUCKILY I WAS ABLE TO COAST INTO A GAS
STATION. CAR STARTED AFTER TURNING OFF AND
BACK ON. ONLY TOOK 16.9 GALLONS TO TOP OFF. THIS
IS THE SECOND TIME THIS HAS HAPPENED. THE
PREVIOUS TIME THE MILES TO EMPTY WAS SHOWING 50
WHEN IT STALLED. I WAS TOLD BY THE DEALERSHIP
THAT THISE IS NO FIX FOR THE CURRENT RECALL.

---

[32] NHTSA Complaint 11187279.

[33] NHTSA Complaint 11173593.

64.     On December 19, 2018, a 2018 Subaru Outback owner reported to NHTSA as

follows:[34]

> CAR STALLED AND RAN OUT OF GAS WHEN THE
> SYSTEM SAID I HAD 20 MILES LEFT. I WAS 2 MILES
> FROM HOME/GAS STATION. THIS HAPPENED AT A
> STREET LIGHT ON A BUSY STREET. *I HAD TO GET OUT
> AND PUSH THE CAR OUT OF THE WAY IN 5 LANES OF
> TRAFFIC*.

65.     On September 22, 2018, a 2018 Subaru Impreza owner reported to NHTSA as

follows:[35]

> THE ENGINE DIED WHILE COMING TO A RAPID STOP
> FROM ABOUT 35-40 MPH. ALL THE LIGHTS ON THE
> INSTRUMENT PANEL TURNED YELLOW. AFTER PUTTING
> THE TRANSMISSION PARK THE ENGINE WOULD NOT
> RESTART. AFTER NUMEROUS ATTEMPTS, REMOVING
> AND REPLACING THE KEY, AND ABOUT 2 TO 3 MINUTES
> THE ENGINE DID START. I WAS UNABLE, AFTER A FEW
> ATTEMPTS, TO REPRODUCE THE PROBLEM. WE TOOK
> THE CAR TO THE DEALER. THEY STATED THAT THEY
> HAD NOT SEEN THIS PROBLEM. THEY DID, HOWEVER,
> PERFORM A SOFTWARE UPDATE IN THE HOPE THAT IT
> WOULD SOLVE THE PROBLEM.

66.     On June 11, 2018, the owner of a 2018 Subaru Impreza filed the following

complaint with NHTSA:[36]

> THE CAR HAS STALLED 3 TIMES WHILE DRIVING. AT A
> STOP SIGN, RED LIGHT AND AT A STOP SIGN. *THE
> INCIDENT AT THE TRAFFIC LIGHT CAUSED THE
> VEHICLE TO START ROLLING BACKWARDS AND
> ALMOST HIT INTO ANOTHIS VEHICLE*. SUBARU CAN
> NOT FIND THE PROBLEM BUT ACKNOWLEDGES THE
> INCIDENTS OF STALLING. THE CAR IS NOT SAFE TO
> DRIVE AND WAS PURCHASED IN THE LATER HALF OF
> APRIL 2018.

---

[34] NHTSA Complaint 11162588.

[35] NHTSA Complaint 11130767.

[36] NHTSA Complaint 11101252.

## 2.     Recalled Vehicles

67.     There have also been innumerable reports about the safety risk of the Recalled

Vehicles. For example, on February 7, 2020, a 2019 Subaru Ascent owner reported to NHTSA as

follows:[37]

> VEHICLE LOSES POWER AFTER RAPID ACCELERATION
> ABOVE 45MPH. A WHOOSHING SOUND OCCURS AND -
> THEN ACCELERATION IS LIMITED. ALL WARNING
> LIGHTS FLASH INCLUDING "CHECK ENGINE." THIS HAS
> OCCURRED ONCE ABOUT A MONTH AGO AND
> DIAGNOSED AS A POORLY REPLACED GAS CAP—
> ALTHOUGH IT WAS ACTUALLY ON SECURELY. IT
> OCCURRED 2 WEEKS LATER 3 MORE TIMES WITHIN TWO
> DAYS. I BROUGHT IT IN WITH THE LIGHTS ON AND
> ISSUE STILL OCCURRING TO SUBARU PACIFIC. THEY
> CLEARED CODES AND TRIED TO RECREATE ISSUE
> WITHOUT SUCCESS. THEY RELEASED THE CAR BACK TO
> ME AFTER CORPORATE DEFERRED TO THEM. UPON
> DRIVING OUT OF DEALERSHIP, THE SAME THING
> HAPPENED ONLY AFTER ACCELERATION ABOVE 18
> MPH—ALL WARNING LIGHTS BACK ON AND
> SPUTTERING/JERKING/LOSS OF POWER. WHOOSHING
> SOUND. DEALER IS IN POSSESSION OF THE CAR AGAIN
> TO LOOK INTO IT. ALSO, THISE TENDS TO BE A GREY-
> BLUE HUE TO THE EXHAUST EACH TIME CAR STARTS.

68.     On July 25, 2019, a 2019 Subaru Ascent owner reported to NHTSA as follows:[38]

> WHEN HOLDING SPEED CONSTANT BETWEEN
> APPROXIMATELY 20-35 MPH, OR UNDER VERY LIGHT
> ACCELERATION IN THIS RANGE, VEHICLE SEEMS TO
> JERK, SURGE, PULSE, OR SIMILAR. IT FEELS SIMILAR TO
> BEING IN THE CAR WITH SOMEONE LEARNING TO
> DRIVE A MANUAL TRANSMISSION

69.     On September 12, 2019, a 2019 Subaru Impreza owner reported to NHTSA as

follows:[39]

---

[37] NHTSA Complaint 11307822.

[38] NHTSA Complaint 11234998.

[39] NHTSA Complaint 11255104.

> CAR STOPPED RUNNING WHILE DRIVING DOWN THE
> STREET. AUTOMOBILE WAS TOWED TO DEALER
> YESTERDAY (9-11-19). DEALER, CALLED TODAY (9-12-19)
> SAID PROBLEM IS A BAD FUEL PUMP AND MAY TAKE UP
> TO A MONTH TO GET THE ORDERED PART DELIVERED
> AND INSTALLED. NEW VEHICLE PURCHASED APRIL,
> 2019 A LITTLE LESS THAN 2800 MILES ON ODOMETER.

70.     Subaru's knowledge of the Fuel Pump Defect but failure to timely and adequately

notify Class members and repair the defect is unconscionable and creates an unreasonable risk of

injury or death to Plaintiffs, Class members, and others.

**3.     Other Subaru Models Not Included**

71.     Based on the NHTSA complaints, the Fuel Pump Defect is not only in pre-2019

Ascents, Outbacks, Imprezas, and Legacies; it is also in other Subaru models, including the

Subaru Forester. For example, on September 4, 2019, a 2019 Subaru Forester owner reported to

NHTSA as follows:[40]

> WHILE DRIVING AROUND 30MPH THE CAR WILL
> SOMETIMES HESITATE AND THEN LURCH IF THE GAS
> PEDAL IS VERY LIGHTLY PRESSED. SOMETIMES IT WILL
> DO IT AT HIGHIS SPEEDS AS WELL, AROUND 50MPH BUT
> NOT TYPICALLY AT FREEWAY SPEED. HAPPENS ON
> MOUNTAIN ROADS AND CITY STREETS. MOST
> NOTICEABLE WHEN KEEPING SPEED WITH A CAR
> AHEAD. WHEN PRESSING HARDER ON THE GAS PEDAL
> IT IS USUALLY NOT NOTICEABLE. WHEN DRIVING IN
> "SPORT" MODE OR WITH MANUAL PADDLE SHIFTERS
> SET AT 4TH GEAR OR LOWER IT DOES NOT HAPPEN.
> THIS IS A CVT SPORT MODEL. DROVE A LOANER OF THE
> SAME YEAR AND TRIM, WHICH SHOWED SIMILAR
> BEHAVIOR, ALTHOUGH LESS COMMON. SUBARU
> CLAIMS IT IS NORMAL BEHAVIOR.

---

[40] NHTSA Complaint 11253275.

72.     On February 7, 2020, a 2019 Subaru Forester owner reported to NHTSA as

follows:[41]

> THE CAR OCCASIONALLY ACTS LIKE IT GOING TO
> STALL , PRIMARILY WHEN TURNING LEFT AT TRAFFIC
> SIGNALS. THE ACCELERATOR HAS TO BE PUSHED HARD
> TO OVERCOME THE APPROXIMATELY 1- 1.5 SECOND
> DELAY BEFORE THE CAR STARTS TO ACCELERATE.
>
> THIS HAS CAUSED NEAR COLLISIONS ON SEVERAL
> OCCASIONS.
>
> THE ENGINE STOP BUTTON WAS ACTIVATED TO
> PREVENT ENGINE STOPPING AT CAR IDLE.

73.     On April 12, 2019, a 2019 Subaru Forrester owner reported to NHTSA the

following:[42]

> IN OUR 2 WEEK OLD 2019 FORESTER, WE WERE DRIVING
> ON THE FREEWAY AT 65MPH AND FELT A SUDDEN JOLT
> AND THE CAR SHUT OFF: THE LIGHTS ON THE
> DASHBOARD WENT OFF, THE HEADLIGHTS WENT OFF,
> THE TURN SIGNALS WOULD NOT WORK AND THE
> ACCELERATOR WASN'T WORKING. WE GUIDED THE
> CAR OFF THE FREEWAY AND SAT ON THE SIDE OF THE
> FREEWAY. THE DEALER'S MASTER MECHANIC CANNOT
> FIND ANY CODE THAT TELLS THEM WHAT IS WRONG SO
> THEY TELL US THISE IS NOTHING TO FIX. ***THIS IS
> OUTRAGEOUS. THIS WAS A LIFE-THREATENING EVENT
> SO WE DO NOT FEEL SAFE DRIVING THE CAR FOR
> OURSELVES AND OTHIS CARS ON THE FREEWAY.
> SUBARU IS NOT TAKING THIS SERIOUSLY***. WE READ
> THISE HAVE BEEN OTHIS "CAR STALL" PROBLEMS
> SIMILAR TO OURS WITH FORESTERS FROM OTHIS
> YEARS.

74.     On January 16, 2018, a 2018 Subaru Forester owner reported the following to

NHTSA:[43]

---

[41] NHTSA Complaint 11307743.

[42] NHTSA Complaint 11195742.

[43] NHTSA Complaint 11063153.

> WHEN ATTEMPTING TO ACCELERATE TO MAKE A LEFT-
> HAND TURN THE CAR STOPPED - THE ENGINE WOULD
> NOT GET ABOVE IDLE, EVEN WHEN THE ACCELERATOR
> WAS PRESSED TO THE FLOOR. THE CAR STOPPED IN
> ONCOMING TRAFFIC. IT DID ACCELERATE AFTER
> COMPLETELY REMOVING PRESSURE FROM THE PEDAL
> AND PUSHING IT PARTIALLY DOWN AGAIN IT BEGAN
> TO PICK UP SPEED.

75.    On September 5, 2018, the owner of a 2018 Subaru Forester filed the following

complaint with NHTSA:[44]

> TL* THE CONTACT OWNS A 2018 SUBARU FORESTER.
> WHILE DRIVING APPROXIMATELY 80 MPH, THE
> VEHICLE SUDDENLY LOST ENGINE POWER. THE
> VEHICLE WAS COASTED TO AN EXIT RAMP. THE
> CONTACT STATED THAT THE ENGINE WAS STILL
> IDLING EXTREMELY LOW AND THE VEHICLE WAS
> TURNED OFF AND RESTARTED. RIMROCK SUBARU (324 S
> 24TH ST W, BILLINGS, MT 59102, (406) 651-5200)
> REPLACED THE FUEL PUMP AND FUEL PUMP CONTROL
> MODULE; HOWEVER, THE FAILURE CONTINUED. THE
> DEALER REFERRED THE CONTACT TO THE
> MANUFACTURER AND OFFERED A TRADE-IN FOR A 2018
> SUBARU OUTBACK. THE MANUFACTURER WAS NOT
> CONTACTED. THE VEHICLE WAS NOT REPAIRED. THE
> APPROXIMATE FAILURE MILEAGE WAS 4,200.

76.    On December 17, 2019, a 2017 Subaru Forester owner reported to NHTSA the

following:[45]

> ON THREE SEPARATE OCCASIONS THUS FAR, WHILE
> DRIVING APPROXIMATELY 70 MPH ON INTERSTATE 93
> IN MASSACHUSETTS AND NEW HAMPSHIRE, MY 2017
> SUBARU FORESTER TOURING (WITH 21K MILES) LOST
> POWER AND COMPLETELY SHUTDOWN. ALL THREE
> TIMES, I WAS LUCKILY ABLE TO STEER THE VEHICLE TO
> SAFETY WHILE AVOIDING OTHIS MOTOR VEHICLES
> AND NEITHIS MYSELF, MY PASSENGERS NOR ANYONE
> ELSE AROUND US WAS HURT. WHEN THE VEHICLE
> DECIDES TO SHUTDOWN, IT FEELS LIKE THE CAR DROPS

---

[44] NHTSA Complaint 11124519.

[45] NHTSA Complaint 11289678.

ITSELF INTO NEUTRAL, THE RPMS SHOOT UP TO ABOUT
4500-5000 AND ALL OF THE LIGHTS ON THE DASHBOARD
LIGHT UP. THISE IS ABOUT A FIVE SECOND WINDOW TO
STEER THE VEHICLE TO SAFETY FROM WHEN YOU
FIRST DETECT THAT THE ISSUE IS OCCURRING. AFTER
WAITING FOR ABOUT 45 MINUTES AFTER THE
INCIDENT, I AM ABLE TO START THE CAR BACK UP AND
DRIVE IT. THIS IS A SERIOUS SAFETY CONCERN OF MINE
(AND IT IS TERRIFYING WHEN IT HAPPENS) AND I HAVE
ALREADY CONTACTED SUBARU OF AMERICA ASKING
FOR A SOLUTION.

I AM NOW CURRENTLY ONLY USING THE CAR ON
SHORT TRIPS AND IF I HAVE TO GET ON THE HIGHWAY,
I STICK TO THE RIGHT LANE AND DO NOT GO OVER 60
MPH.

77.    On January 15, 2020, a 2015 Subaru Forester owner reported to NHTSA as

follows:[46]

TWO TIMES, WHILE DRIVING ON THE HIGHWAY AT
ABOUT 65 MPH, MY CAR LOST THE ABILITY TO
ACCELERATE. IT WAS AS THOUGH THE CAR SLIPPED
INTO NEUTRAL. I PUSHED THE ACCELERATOR PEDAL
AND THE RPM'S WOULD INCREASE, BUT THE CAR
WOULDN'T ACCELERATE. IT SIMPLY SLOWED DOWN.
BOTH TIMES THE HIGHWAY WAS EMPTY ENOUGH THAT
I WAS ABLE TO DRIFT INTO THE SHOULDER.

ONCE I PULLED OVER, I TURNED OFF THE CAR AND
WAITED A FEW MINUTES. WHEN I TURNED IT BACK ON,
THE CAR STARTED AND ACCELERATION WORKED AS
NORMAL.

BOTH TIMES I BROUGHT IT TO A LOCAL SUBARU
DEALERSHIP, AND AFTER RUNNING SOME TESTS SAID
THEY COULDN'T FIND ANY ISSUES, AND COULDN'T
HELP ME ANY FURTHIS.

*I'VE FOUND OTHIS PEOPLE WHO HAVE EXPERIENCED
VERY SIMILAR PROBLEMS, BUT IT SEEMS LIKE NO ONE
HAS FOUND A SOLUTION.*

---

[46] NHTSA Complaint 11299582.

78.     On December 23, 2019, a 2015 Subaru Forester owner reported to NHTSA as follows:[47]

> WHILE DRIVING ON HIGHWAY AT 70MPH, THE VEHICLE SUDDENLY LOST POWER. THE ENGINE REVVED BUT NO RESPONSE, LIKE IT WAS IN NEUTRAL. THE ENGINE DID NOT COMPLETELY SHUT OFF, AND I WAS ABLE TO GET OVER TOTHE SHOULDER. WHILE COASTING ON THE SHOULDER, THE CAR SPUTTERED AS IF IT WAS OUT OF GAS, BUT I HAD 1/4 TANK. IT THEN BEGAN TO RUN NORMALLY. I PULLED OFF TO A GAS STATION, FILLED IT UP, AND CONTINUED MY TRIP WITHOUT A PROBLEM. ***THE OCCURRENCE WAS VERY DANGEROUS ON A CONGESTED HIGHWAY***.

79.     On November 18, 2019, a 2014 Subaru Forester owner reported to NHTSA as follows:[48]

> 2014 SUBARU FORESTER STOPPED RUNNING WHILE DRIVING DOWN THE FREEWAY AT 70 MILES AN HOUR. ENGINE JUST QUITE RUNNING. ***LOST POWER. HAD TO PULL OVER IN MEDIAN. VERY SCARY. THIS IS SECOND TIME THIS HAS HAPPENED***. DID NOT THROW A CODE MESSAGE. DEALERSHIP CAN NOT DETECT PROBLEM. FIRST TIME WAS 4 YEARS AGO WHEN DRIVING AT 35 MPH ON CITY STREET COMING INTO TOWN. DID NOT THROW ERROR MESSAGE AT THAT TIME WAS TOLD TO DRIVE IT UNTIL IT DID IT AGAIN.

80.     On August 17, 2019, a 2013 Subaru Forester owner reported to NHTSA as follows:[49]

> LACK OF POWER WHEN I TRY TO ACCELERATE. THE VEHICLE FEEL DOES'T GO WHEN I PRESS THE GAS FROM GETTING OUT OF STOP FOR A 10 SECONDS.

---

[47] NHTSA Complaint 11290811.

[48] NHTSA Complaint 11280804.

[49] NHTSA Complaint 11244720.

###### 4.    Affected 2020 Vehicles

81.    Finally, even as the 2020 models have only been on the market for months, NHTSA complaints reveal that the Fuel Pump Defect is present in these models as well. For example, on April 21, 2020, a 2020 Subaru Outback owner reported to NHTSA as follows:[50]

> WHEN DRIVING MY VEHICLE AROUND 50-70 IT WILL HESITATE AND ACTS LIKE IT WANTS TO STOP.
>
> NO WARNING LIGHTS COME ON HAVE TAKING BACK TO THE DEALER. THEY COULDN'T GET IT TO DO THIS. THE VEHICLE IS NOT COLD WHEN THIS HAPPENS. IT CAN BE AFTER I'VE BEEN DRIVING FOR 30 MINUTES OR MORE. THIS HAPPENS ON MAIN ROADS AND HIGHWAYS.

82.    The above complaints are just a small subset of the complaints submitted to NHTSA for sudden stalls and pump failures in the Affected Vehicles. The safety implications are obvious, as illustrated by the events described above and Subaru's eventual admission by its decision to issue a safety recall.

83.    It cannot reasonably be questioned that Subaru is now, and was long before it first began selling Affected Vehicles, fully aware of the Fuel Pump Defect in the Affected Vehicles. Subaru has acquired that knowledge through at least: (1) NHTSA complaints; (2) warranty claims; (3) non-warranty repair records; (4) testing it claims to undertake in the development of new models; and (5) customer complaints to Subaru and its dealers.

84.    Like all vehicle manufacturers, Subaru monitors consumer reports and sentiments about its products that appear on social media, blogs, review sites, enthusiast sites, and other internet resources. Subaru has toll-free numbers and email and other communication systems that are devoted to obtaining information (and complaints) from consumers about their products.

---

[50] NHTSA Complaint 11321843.

Subaru has certainly received numerous complaints about the Fuel Pump Defect in Affected

Vehicles, as evidenced, in part, by the NHTSA complaints that expressly indicate contact with

Subaru directly and its dealers.

85.     Subaru also receives technical information and reports from its dealers and

service centers concerning warranty repairs, requests for warranty coverage, and safety

complaints from vehicle owners.

**D.      Subaru Sells, Markets, and Advertises Subaru and Lexus Brand Vehicles as Safe and Reliable**

86.     Subaru spends millions of dollars on advertising and focuses that advertising

intently on claims of safety and reliability. Subaru knows and intends that consumers, including

purchasers of Affected Vehicles, will buy their vehicles because they believe them to be safe and

reliable.

87.     Subaru's website amplifies this message and emphasizes the safety and

dependability of Subaru vehicles, including the Affected Vehicles. Below is a screenshot from

Subaru's website showing the portrayal of its vehicles as safe and dependable.



88.     On its website, Subaru proclaims that "When you choose a Subaru, you're not just

choosing a car. You're choosing a company with a lifetime commitment to protecting those you

love." At no point does Subaru disclose the Fuel Pump Defect or the safety risks created by the defect.

89.     Subaru made similar representations regarding older model Affected Vehicles as well. In 2013, Subaru was touting the safety and reliability of its vehicles, including the Affected Vehicles; below is a snapshot of its website regarding safety and dependability:[51]



90.     Subaru continued this uniform and pervasive marketing message of safety and dependability throughout the Class period—from 2013 to the present.

91.     Subaru also emphasized the safety and dependability in advertising for the Affected Vehicles. Subaru's website contains the sales brochures for its current vehicles, as well as older models. These brochures consistently trumpet the safety and dependability of the Affected Vehicles. For example, below is a screenshot of a 2019 Subaru Outback sales brochure:[52]

---

[51] http://web.archive.org/web/20130807123214/http://www.subaru.com/why-subaru/ livelove.html?referralType=allvehicles (last visited July 7, 2020).

[52] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2019/Outback/ MY19_OBK_Brochure.pdf (last visited July 7, 2020).



92.     Subaru made identical statements regarding the 2019 Subaru Impreza, as

illustrated below:[53]



93.     Subaru made similar statements regarding *all* Affected Vehicles. For example,

below is a screenshot of a 2018 Subaru Impreza sales brochure:[54]

---

[53] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2019/Impreza/
MY19_IMP_Brochure.pdf (last visited July 7, 2020).

[54] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2018/Impreza/
2018_Subaru_Impreza.pdf (last visited July 7, 2020).



94.    Below is a screenshot of a 2017 Subaru Outback sales brochure:[55]



[55] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2018/Outback/2018_Subaru_Outback.pdf (last visited July 7, 2020).

95.     Below is a screenshot of a 2016 Subaru Forester sales brochure:[56]



96.     Below is a screenshot of a 2015 Subaru Outback sales brochure:[57]



---

[56] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2016/Forester/
2016_Forester.pdf (last visited July 7, 2020).

[57] https://cdn.dealereprocess.net/cdn/brochures/subaru/2015-outback.pdf (last visited July 7, 2020).

97.    Below is a screenshot of a 2014 Subaru Legacy sales brochure:[58]



---

[58] https://cdn.dealereprocess.org/cdn/brochures/subaru/2014-legacy.pdf (last visited July 7, 2020).

98.     Below is a screenshot of a 2013 Subaru Outback sales brochure:[59]



99.     Even as Subaru has known for years about the Fuel Pump Defect, it decided to continue to emphasize the safety and dependability of its vehicles, including the Affected Vehicles. Subaru never disclosed the Fuel Pump Defect or the unreasonable risk to safety it poses.

100.    Subaru's advertising for Affected Vehicles conveys a pervasive message that its vehicles are safe and reliable. Safety and reliability are material to consumers when purchasing or leasing a vehicle.

101.    Subaru advertised Affected Vehicles as safe and reliable, but it concealed the danger of the Fuel Pump Defect. Subaru:

---

[59] https://cdn.dealereprocess.net/cdn/brochures/subaru/2013-outback.pdf (last visited July 7, 2020).

a.      Failed to disclose, at and after the time of purchase, lease, and/or service, the Fuel Pump Defect, despite its knowledge;

b.      Failed to disclose, at and after the time of purchase, lease, and/or service, that the Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

c.      Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge..

**E.      Plaintiffs and Class Members Would Not Have Purchased or Leased, or Would Have Paid Less for, Affected Vehicles Had They Known of the Fuel Pump Defect**

102.    No owner or lessee of an Affected Vehicle would have purchased their vehicle, or at least would have paid less for their Affected Vehicle, had they known that the fuel delivery system might unexpectedly fail, or had they known that Subaru would fail to fix a known defect in the low-pressure fuel pump.

103.    As a result of the Fuel Pump Defect in Affected Vehicles and the costs of repairs required to ameliorate it, Plaintiffs and all owners of Affected Vehicles (the "Class") have suffered injury in fact, incurred damages, and have suffered harm as a result of Subaru's acts and omissions. Plaintiffs and Class members seek remedies under the consumer protection statutes of the states in which they reside and/or purchased their Affected Vehicles, and also seek recovery for Subaru's breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and fraudulent concealment.

104.    Plaintiffs and each Class member suffered injury as they purchased their Affected Vehicle under the express and implied warranties that their vehicles would operate safely throughout the useful life of such vehicles. A vehicle containing the Fuel Pump Defect does not operate as warranted and for its intended purpose because it does not operate safely or reliably.

In addition, an Affected Vehicle is worth less than a correctly operating/non-faulty Affected Vehicle.

**F.     Subaru Has Manipulated Its Warranty to Minimize Its Obligation to Fix the Fuel Pump Defect in Affected Vehicles**

105.    In connection with the sale of new vehicles, including the Affected Vehicles, Subaru provides a warranty for the lesser of three years or 36,000 miles.

106.    The warranty states:

> These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use . . . .

> BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first. Subject to the exclusions listed in this warranty, it covers the entire vehicle.

107.    Subaru also offers a five-year 60,000-mile powertrain warranty. Subaru offers extended warranty options, including 8-years/120,000 miles and 10-years/10,000 miles.

108.    In order to obtain repairs under the warranty, owners and lessees of covered vehicles are told by Subaru to present their vehicles to certified Subaru retailers.

109.    Subaru is not honoring the plain language of its warranty agreement. Even when owners of Affected Vehicles have presented their cars to Subaru service centers and complained of issues traceable to the Fuel Pump Defect, Subaru has: (1) failed to notify them of the Fuel Pump Defect in their Affected Vehicles; and/or (2) notified them of the recall associated with the Fuel Pump Defect, but refused to repair the defect or provide alternative/replacement transportation that is not defective. Likewise, Affected Vehicle owners who do not complain of issues relating to the Fuel Pump Defect are never informed of the Fuel Pump Defect in Affected Vehicles, and are never offered a repair. Subaru has also failed to notify Affected Vehicle owners of the 2020 recall.

G.    **Allegations Establishing Agency Relationship Between Manufacturer Subaru and Subaru Dealerships.**

110.    Upon information and belief, Subaru impliedly or expressly acknowledged that Subaru-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Subaru has the ability to control authorized Subaru dealers, and Subaru acts as the principal in that relationship, as is shown by the following:

    i.    Manufacturer Subaru can terminate the relationship with its dealers at will;

    ii.    The relationships are indefinite;

    iii.    Manufacturer Subaru is in the business of selling vehicles as are its dealers;

    iv.    Manufacturer Subaru provides tools and resources for Subaru dealers to sell vehicles;

    v.    Manufacturer Subaru supervises its dealers regularly;

    vi.    Without Manufacturer Subaru, the relevant Subaru dealers would not exist;

    vii.    Manufacturer Subaru requires the following of its dealers:

        a.    Reporting of sales;

        b.    Computer network connection with Manufacturer Subaru;

        c.    Training of dealers' sales and technical personnel;

        d.    Use of Manufacturer Subaru-supplied computer software;

        e.    Participation in Manufacturer Subaru's training programs;

        f.    Establishment and maintenance of service departments in Subaru dealerships;

        g.    Certify Subaru pre-owned vehicles;

        h.    Reporting to Manufacturer Subaru with respect to the vehicle delivery, including reporting Class members' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable,

vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

  i. Displaying Manufacturer Subaru logos on signs, literature, products, and brochures within Subaru dealerships.

viii. Dealerships bind Manufacturer Subaru with respect to:

  a. Warranty repairs on the vehicles the dealers sell; and

  b. Issuing service contracts administered by Manufacturer Subaru.

ix. Manufacturer Subaru further exercises control over its dealers with respect to:

  a. Financial incentives given to Subaru dealer employees;

  b. Locations of dealers;

  c. Testing and certification of dealership personnel to ensure compliance with Manufacturer Subaru's policies and procedures; and

  d. Customer satisfaction surveys, pursuant to which Manufacturer Subaru allocates the number of Subaru cars to each dealer, thereby directly controlling dealership profits.

x. Subaru dealers sell Subaru vehicles on Manufacturer Subaru's behalf, pursuant to a "floor plan," and Manufacturer Subaru does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear Subaru's brand names, use Subaru's logos in advertising and on warranty repair orders, post Subaru-brand signs for the public to see, and enjoy a franchise to sell Manufacturer Subaru's products, including the Affected Vehicles.

xii. Manufacturer Subaru requires Subaru dealers to follow the rules and policies of Manufacturer Subaru in conducting all aspects of dealer business, including the delivery of Manufacturer Subaru's warranties described above, and the servicing of defective vehicles such as the Affected Vehicles.

xiii. Manufacturer Subaru requires its dealers to post Subaru's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Subaru dealers and servicing outlets for Manufacturer Subaru cars.

- 43

xiv.   Manufacturer Subaru requires its dealers to use service and repair forms containing Manufacturer Subaru's brand names and logos.

xv.   Manufacturer Subaru requires Subaru dealers to perform Manufacturer Subaru's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer Subaru.

xvi.   Manufacturer Subaru requires Subaru dealers to use parts and tools either provided by Manufacturer Subaru, or approved by Manufacturer Subaru, and to inform Subaru when dealers discover that unauthorized parts have been installed on one of Manufacturer Subaru's vehicles.

xvii.   Manufacturer Subaru requires dealers' service and repair employees to be trained by Subaru in the methods of repair of Subaru-brand vehicles.

xviii.   Manufacturer Subaru audits Subaru dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.   Manufacturer Subaru requires its dealers to provide Subaru with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer Subaru's vehicles.

xx.   Manufacturer Subaru provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.   Manufacturer Subaru provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer Subaru to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Manufacturer Subaru requires Subaru-brand vehicle owners to go to authorized Subaru dealers to obtain servicing under Subaru warranties.

xxiii.   Subaru dealers are required to notify Manufacturer Subaru whenever a car is sold or put into warranty service.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

111.   Class members had no way of knowing about Subaru's deception with respect to the Fuel Pump Defect in the Affected Vehicles.

- 44

112.     Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Subaru was concealing the Fuel Pump Defect in the Affected Vehicles and misrepresenting the safety, quality, and reliability of the Affected Vehicles.

113.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Subaru did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Subaru had concealed information about the true nature of the Fuel Pump Defect in the Affected Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiffs and other Class members have disclosed that Subaru valued profits over the safety of its customers, their friends and family, and innocent bystanders.

114.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims asserted herein.

**B.     Fraudulent Concealment Tolling**

115.     All applicable statutes of limitation have also been tolled by Subaru's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

116.     Instead of disclosing the existence of the Fuel Pump Defect, Subaru falsely represented that the Affected Vehicles were safe, dependable, reliable, and of high quality.

C.       **Estoppel**

117.     Subaru was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fuel delivery system in the Affected Vehicles.

118.     Subaru knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel delivery system in the Affected Vehicles.

119.     Based on the foregoing, Subaru is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CHOICE OF LAW ALLEGATIONS

120.     Because this Complaint is brought in New Jersey, New Jersey's choice of law regime governs the state law allegations in this Complaint. Under New Jersey's choice of law rules, New Jersey law applies to the claims of all Class members, regardless of their state of residence or state of purchase.

121.     Because Subaru is headquartered in New Jersey, and made all decisions related to these claims in this State, New Jersey has a substantial connection to, and materially greater interest in, the rights, interests, and policies involved in this action compared to any other state. Application of New Jersey law to Subaru and the claims of all Class members would accordingly not be arbitrary or unfair.

## VIII.   CLASS ALLEGATIONS

122.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

**The Nationwide Class**

> All persons or entities in the United States who owned and/or
> leased a Subaru vehicle with the Denso low-pressure fuel pump,
> including with part number prefix 42022-.

**The Florida Subclass**

> All persons or entities in the state of Florida who owned and/or
> leased a Subaru vehicle with the Denso low-pressure fuel pump,
> including with part number prefix 42022-.

**The Minnesota Subclass**

> All persons or entities in the state of Minnesota who owned and/or
> leased a Subaru vehicle with the Denso low-pressure fuel pump,
> including with part number prefix 42022-

123.    Excluded from the Class are individuals who have personal injury claims

resulting from the fuel delivery system in the Affected Vehicles. Also excluded from the Class is

Subaru and its subsidiaries and affiliates; all persons who make a timely election to be excluded

from the Class; governmental entities; and the Judge to whom this case is assigned and his/her

immediate family. Plaintiffs reserve the right to revise the Class definition based upon

information learned through discovery.

124.    Certification of Plaintiffs' claims for classwide treatment is appropriate because

Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

125.    This action has been brought and may be properly maintained on behalf of each of

the Classes proposed herein under Federal Rule of Civil Procedure 23.

126.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the

Classes are so numerous and geographically dispersed that individual joinder of all Class

members is impracticable. While Plaintiffs are informed and believe—based on publicly

available sales data for the Affected Vehicles—that there are at least 200,000 members of the

Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Subaru's books and records, as well as the recall reports that Subaru has submitted to NHTSA. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

127.    **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Subaru engaged in the conduct alleged herein;

b.    Whether Subaru designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Affected Vehicles into the stream of commerce in the United States;

c.    Whether the Affected Vehicles contain a defect in their fuel delivery system and if so, whether it is a safety defect;

d.    Whether Subaru knew about the defect in the fuel delivery system of the Affected Vehicles and, if so, how long Subaru has known;

e.    When Subaru discovered the Fuel Pump Defect in the Affected Vehicles, and what, if anything, they did in response;

f.    Whether Subaru has sought to minimize their warranty expenses by refusing to repair the Fuel Pump Defect in the Affected Vehicles;

g.    Whether Subaru engaged in breach of contract and fraudulent concealment as asserted herein;

h.    Whether Plaintiffs and the other Class members overpaid for their Affected Vehicles;

i.    Whether Plaintiffs experienced out-of-pocket losses from replacing parts as a result of the Fuel Pump Defect, and if so, how much; and

j.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

128.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Subaru's wrongful conduct as described above.

129.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

130.  **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): Subaru has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

131.  **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Subaru, so it would be impracticable for the members of the Classes to individually seek redress for Subaru's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

A.   **Claims Brought on Behalf of the Nationwide Class**

## COUNT I

**VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.***
**THE MAGNUSON-MOSS WARRANTY ACT**

132.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

133.   This claim is brought on behalf of the Nationwide Class.

134.   Plaintiffs are each a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

135.   Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

136.   The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

137.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

138.   Subaru's written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Affected Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

139.   Subaru breached these warranties, as described in more detail above. Without limitation, the Affected Vehicles are equipped with a defective fuel delivery system that fails to function as expected, and can cause loss of power and stalls, leading to vehicle accidents and collisions. The Affected Vehicles share a common design defect in that the fuel delivery system fails to operate as represented by Subaru.

140.     Plaintiffs and the other Class members have had sufficient direct dealings with either Subaru or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between Subaru on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

141.     Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

142.     At the time of sale or lease of each Affected Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Affected Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Subaru has expressly admitted the existence of the Fuel Pump Defect and that it is a safety defect, but notwithstanding its recall of nearly 200,000 Affected Vehicles, it has not offered a fix or indicated that a fix is available. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

143.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them.

Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Affected Vehicles by retaining them.

144.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

145.     Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Affected Vehicles, in an amount to be proven at trial.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON COMMON LAW)

146.     Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further allege as follows:

147.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

148.     Subaru intentionally concealed that the Affected Vehicles are defective.

149.     Subaru further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each Affected Vehicle and on its website, that the Affected Vehicles it was selling had no significant defects, that the Affected Vehicles were safe, reliable, and of high quality, and would perform and operate in a safe manner.

150.     Subaru knew about the defect in the Affected Vehicles when these representations were made.

151.    The Affected Vehicles purchased by Plaintiffs and the other Class members contained defective fuel delivery systems.

152.    Subaru had a duty to disclose that the Affected Vehicles contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Subaru's material representations.

153.    As alleged herein, at all relevant times, Subaru has held out the Affected Vehicles to be free from defects such as the Fuel Pump Defect. Subaru touted and continues to tout the many benefits and advantages of the Affected Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Subaru's other disclosures about the Affected Vehicles deceptive.

154.    The truth about the defective Affected Vehicles was known only to Subaru; Plaintiffs and the other Class members did not know of these facts and Subaru actively concealed these facts from Plaintiffs and Class members.

155.    Plaintiffs and the other Class members reasonably relied upon Subaru's deception. They had no way of knowing that Subaru's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own. Rather, Subaru intended to deceive Plaintiffs and Class members by concealing the true facts about the Affected Vehicles.

156.    Subaru's false representations and omissions were material to consumers because they concerned the safety of the Affected Vehicles, which played a significant role in the value of the Affected Vehicles.

157.    Subaru had a duty to disclose the Fuel Pump Defect and violations with respect to the Affected Vehicles because they concerned the safety of the Affected Vehicles, the details of

the true facts were known and/or accessible only to Subaru, because Subaru had exclusive

knowledge as to such facts, and because Subaru knew these facts were not known to or

reasonably discoverable by Plaintiffs or Class members.

158.    Subaru also had a duty to disclose because it made general affirmative

representations about the safety and reliability of the Affected Vehicles, without telling

consumers that the Affected Vehicles had a fundamental system defect that would affect the

safety, quality, and reliability of the Affected Vehicles.

159.    Subaru's disclosures were misleading, deceptive, and incomplete because they

failed to inform consumers of the additional facts regarding the Fuel Pump Defect as set forth

herein. These omitted and concealed facts were material because they directly impact the safety

and value of the Affected Vehicles purchased by Plaintiffs and Class members.

160.    Subaru has still not made full and adequate disclosures and continues to defraud

Plaintiffs and Class members by concealing material information regarding the defect in the

Affected Vehicles.

161.    Plaintiffs and Class members were unaware of the omitted material facts

referenced herein, and they would not have acted as they did if they had known of the concealed

and/or suppressed facts, in that they would not have purchased or paid as much for the Affected

Vehicles with the Fuel Pump Defect, and/or would have taken other affirmative steps in light of

the information concealed from them. Plaintiffs' and Class members' actions were justified.

Subaru was in exclusive control of the material facts, and such facts were not generally known to

the public, Plaintiffs, or Class members.

162.    Because of the concealment and/or suppression of facts, Plaintiffs and Class

members sustained damage because they own Affected Vehicles that are diminished in value as a

result of Subaru's concealment of the true safety and quality of the Affected Vehicles. Had Plaintiffs and Class members been aware of the Fuel Pump Defect, and Subaru's disregard for the truth, Plaintiffs and Class members would have paid less for their Affected Vehicles or would not have purchased them at all.

163.    The value of Plaintiffs' and Class members' Affected Vehicles has diminished as a result of Subaru's fraudulent concealment of the Fuel Pump Defect, which has made any reasonable consumer reluctant to purchase an Affected Vehicle, let alone pay what otherwise would have been fair market value for the Affected Vehicle.

164.    Accordingly, Subaru is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

165.    Subaru's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Subaru made to them, in order to enrich Subaru. Subaru's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (COMMON LAW)

166.    Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further allege as follows.

167.    Plaintiffs asserts this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the state Subclasses.

168.    Subaru's misrepresentations and omissions alleged herein, including but not limited to, Subaru's concealment and suppression of material facts concerning the Affected

Vehicles, including the reliability and durability of the fuel delivery system, caused Plaintiffs and the other Class members to make their purchases or leases of their Affected Vehicles.

169.    Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased different vehicles that did not contain the Defective Fuel Pump. Accordingly, Plaintiffs and other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

170.    Each and every sale or lease of an Affected Vehicle constitutes a contract between Subaru and the purchaser or lessee. Subaru breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Affected Vehicles and by misrepresenting or failing to disclose material facts concerning the safety, durability, performance, and quality of the Affected Vehicles.

171.    As a direct and proximate result of Subaru's breach of contract, Plaintiffs and other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV

## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
## (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

172.    Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further allege as follows:

173.    Plaintiffs bring this Count on behalf of themselves and all similarly situated residents of the state of New Jersey for violations of New Jersey's Consumer Fraud Act.

174.    Defendants and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

175.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

176.    The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("N.J. CFA"), makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2. Defendants engaged in unconscionable commercial practice or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs rely upon their acts of concealment, suppression, and/or omission.

177.    Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members.

178.    Defendants intentionally, affirmatively, and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiffs and the Class.

179.    Defendants knew or should have known that its conduct violated the New Jersey CFA.

180.    Plaintiffs and other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value.

These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

181.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

182.    Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the other Class members seek an order enjoining Defendants' unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CPA.

<div align="center">

**COUNT V**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J. STAT. ANN. § 12A:2-314)**

</div>

183.    Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further allege as follows:

184.    Plaintiffs bring this Count on behalf of themselves and all other Class members for violations of implied warranty of merchantability under New Jersey law.

185.    Each defendant is a merchant with respect to motor vehicles within the meaning of N.J. Stat. Ann. § 12A:2-314.

186..   Under N.J. Stat. Ann. § 12A:2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased an Affected Vehicle from Defendants.

187.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

188.    Defendants marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with

<div align="center">

- 58

</div>

industry standards. Such representations formed the basis of the bargain in Plaintiffs' and the state Subclass members' decisions to purchase the Affected Vehicles.

189.    Plaintiffs and other New Jersey Subclass members purchased the Affected Vehicles from Defendants, or through Defendants' authorized agents for retail sales. At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

190.    Defendants knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

191.    Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

192.    Defendants knew about the defect in the Affected Vehicles, allowing Defendants to cure their breach of warranty if they chose.

193.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and other New Jersey Subclass members. Among other things, Plaintiffs and other New Jersey Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and New Jersey Subclass members, and Defendants knew of the defect at the time of sale.

194.     Plaintiffs and New Jersey Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

195.     Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

196.     Accordingly, Defendants are liable to Plaintiffs and New Jersey Subclass members for damages in an amount to be proven at trial.

<div align="center">

**COUNT VI**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
(BASED ON NEW JERSEY STATE LAW)**

</div>

197.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

198.     Plaintiffs bring this Count on behalf of themselves and all similarly situated Class members.

199.     Plaintiffs and other Class members entered into contracts with Defendants in connection with the sale of the Affected Vehicles.

200.     Plaintiffs and other Class members gave fair and reasonable consideration and performed all their material obligations under the contracts.

201.     Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

202.     Plaintiffs and other Class members had a reasonable expectation that, when they purchased their Affected Vehicles from Defendants, the Affected Vehicles would be free of defects, especially defects that affected the safety and operability of the Affected Vehicles.

203.    Defendants used their discretion to place inferior low-pressure fuel pumps into the Affected Vehicles without informing Plaintiffs and New Jersey Subclass members that the inferior technology would create a safety defect in the Affected Vehicles.

204.    Plaintiffs and New Jersey Subclass members had no reason to know Defendants had placed inferior low-pressure fuel pumps into the Affected Vehicles.

205.    By creating and promoting an automobile with a latent safety defect, Defendants breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiffs and New Jersey Subclass members.

206.    As a direct and proximate result of Defendants' breach, Plaintiffs and New Jersey Subclass members suffered damages, including being induced to purchase the defective Affected Vehicles.

**B.    Claims Brought on Behalf of the Florida Subclass**

**COUNT VII**

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT ("FDUTPA")
(FLA. STAT. ANN. § 501.201, *ET SEQ.*)**

207.    Plaintiff Gilles Cohen (for purposes of the next three counts, "Plaintiff") restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

208.    Plaintiff alternatively brings this Count on behalf of himself and all similarly situated residents of the state of Florida for violations of Florida's Deceptive and Unfair Trade Practices Act.

209.    Plaintiff and other Florida Subclass members who purchased their vehicles new are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.203(7).

210.    Subaru engaged in "trade or commerce" within the meaning of Fla. Stat. Ann.

§ 501.203(8).

211.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla.

Stat. Ann. § 501.204(1). Subaru participated in unfair and deceptive trade practices that violated

the FDUTPA as described herein. In the course of its business, Subaru concealed and suppressed

material facts concerning the Fuel Pump Defect. Subaru falsely represented the quality of the

Affected Vehicles and omitted material facts regarding the fuel pump, as well as the durability

and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other Florida

Subclass members to purchase the Affected Vehicles, and to increase Subaru's revenue and

profits.

212.    The facts concealed and omitted by Subaru were material in that a reasonable

consumer would have considered them to be important in deciding whether to purchase or lease

the Affected Vehicles or pay a lower price. Had Plaintiff and other Florida Subclass members

known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or

would have paid substantially less for the vehicles than they did.

213.    Subaru's conduct proximately caused injuries to Plaintiff and the other Florida

Subclass members.

214.    Plaintiff and the other Florida Subclass members were injured and suffered

ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct

in that Plaintiff and the other Florida Subclass members overpaid for their Affected Vehicles and

did not receive the benefit of their bargain, and their Affected Vehicles have suffered a

diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

215.    Subaru's violations present a continuing risk to Plaintiff as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

216.    Accordingly, Subaru is liable to Plaintiff and the other Florida Subclass members for damages in an amount to be proven at trial.

<div align="center">

**COUNT VIII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(FLA. STAT. ANN. §§ 672.314 AND 680.212)**

</div>

217.    Plaintiff restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

218.    Plaintiff brings this Count on behalf of himself and all other similarly situated residents of the state of Florida for violations of implied warranty of merchantability under Florida law.

219.    Subaru was at all times a "merchant" with respect to motor vehicles under Fla. Stat. Ann. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

220.    With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

221.    The Affected Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

222.    A warranty that the Affected Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Fla. Stat. Ann. §§ 672.314 and 680.212.

223.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

224.    Subaru marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Florida Subclass members' decisions to purchase the Affected Vehicles.

225.    Plaintiff and other Florida Subclass members purchased the Affected Vehicles from Subaru, or through Subaru's authorized agents for retail sales. At all relevant times, Subaru was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

226.    Subaru knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

227.    Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

228.    Subaru knew about the defect in the Affected Vehicles, allowing Subaru to cure their breach of warranty if it chose to do so.

229.    Subaru's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Subaru's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Subaru's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Florida Subclass members. Among other things, Plaintiff and other Florida Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Subaru. A gross

disparity in bargaining power existed between Subaru and Florida Subclass members, and Subaru knew of the defect at the time of sale.

230.    Plaintiff and Florida Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein. Affording Subaru a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

231.    Subaru was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

232.    Accordingly, Subaru is liable to Plaintiff and Florida Subclass members for damages in an amount to be proven at trial.

## COUNT IX

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (BASED ON FLORIDA STATE LAW)

233.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

234.    Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Florida.

235.    Plaintiff and Florida Subclass members entered into contracts with Subaru in connection with the sale of the Affected Vehicles.

236.    Plaintiff and Florida Subclass members gave fair and reasonable consideration and performed all their material obligations under the contracts.

237.    Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

238.    Plaintiff and Florida Subclass members had a reasonable expectation that when they purchased their Affected Vehicles from Subaru, the Affected Vehicles would be free of defects, especially defects that affected the safety and operability of the Affected Vehicles.

239.    Subaru made the decision to place inferior low-pressure fuel pumps into the Affected Vehicles without informing Plaintiff and Florida Subclass members that the inferior technology would create a safety defect in the Affected Vehicles.

240.    Plaintiff and Florida Subclass members had no reason to know Subaru had placed inferior low-pressure fuel pumps into the Affected Vehicles.

241.    By creating and promoting an automobile with a latent safety defect, Subaru breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiff and Florida Subclass members.

242.    As a direct and proximate result of Subaru's breach, Plaintiff and Florida Subclass members suffered damages, including being induced to purchase the defective Affected Vehicles.

**C.    Claims Brought on Behalf of the Minnesota Subclass**

**COUNT X**

**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68 *ET SEQ.*)**

243.    Plaintiff John Micklo (for purposes of the next three counts, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

244.    Plaintiff brings this Count on behalf of the Minnesota Subclass members.

245.    The Affected Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

246.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69.

247.     In the course of its business, Subaru concealed and suppressed material facts concerning the Fuel Pump Defect. Subaru falsely represented the quality of the Affected Vehicles and omitted material facts regarding the fuel pump, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other Minnesota Subclass members to purchase the Affected Vehicles, and to increase Subaru's revenue and profits.

248.     The facts concealed and omitted by Subaru were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Minnesota Subclass members known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

249.     Subaru's violations present a continuing risk to Plaintiff as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

250.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

251.     Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights of others.

## COUNT XI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MINN. STAT. § 336.2-314)

252.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

253.     Plaintiff brings this Count on behalf of the Minnesota Subclass members.

254.     Subaru is a merchant with respect to motor vehicles within the meaning of the Minn. Stat. § 336.2-314.

255.     Under Minn. Stat. § 336.2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and Minnesota Subclass members purchased or leased their Affected Vehicles from Subaru.

256.     The Affected Vehicles, when sold or leased and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which vehicles are used.

257.     The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

258.     Subaru marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Minnesota Subclass members' decisions to purchase the Affected Vehicles.

259.     Plaintiff and other Minnesota Subclass members purchased the Affected Vehicles from Subaru, or through Subaru's authorized agents for retail sales. At all relevant times, Subaru was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

260.     Subaru knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

261.    Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

262.    Subaru knew about the defect in the Affected Vehicles, allowing Subaru to cure their breach of warranty if it chose to do so.

263.    Subaru's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Subaru's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Subaru's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Minnesota Subclass members. Among other things, Plaintiff and other Minnesota Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Subaru. A gross disparity in bargaining power existed between Subaru and Minnesota Subclass members, and Subaru knew of the defect at the time of sale.

264.    Plaintiff and Minnesota Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein. Affording Subaru a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

265.    Subaru was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

266.    Accordingly, Subaru is liable to Plaintiff and Minnesota Subclass members for damages in an amount to be proven at trial.

## COUNT XII
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (BASED ON MINNESOTA STATE LAW)

267.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

268.    Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Minnesota.

269.    Plaintiff and Minnesota Subclass members entered into contracts with Subaru in connection with the sale of the Affected Vehicles.

270.    Plaintiff and Minnesota Subclass members gave fair and reasonable consideration and performed all their material obligations under the contracts.

271.    Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

272.    Plaintiff and Minnesota Subclass members had a reasonable expectation that when they purchased their Affected Vehicles from Subaru, the Affected Vehicles would be free of defects, especially defects that affected the safety and operability of the Affected Vehicles.

273.    Subaru made the decision to place inferior low-pressure fuel pumps into the Affected Vehicles without informing Plaintiff and Minnesota Subclass members that the inferior technology would create a safety defect in the Affected Vehicles.

274.    Plaintiff and Minnesota Subclass members had no reason to know Subaru had placed inferior low-pressure fuel pumps into the Affected Vehicles.

275.    By creating and promoting an automobile with a latent safety defect, Subaru breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiff and Minnesota Subclass members.

276.    As a direct and proximate result of Subaru's breach, Plaintiff and Minnesota Subclass members suffered damages, including being induced to purchase the defective Affected Vehicles

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against Subaru, as follows:

A.    Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.    Restitution, including at the election of Class members, recovery of the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles;

C.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.    An order requiring Subaru to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

Dated: July 7, 2020                                Respectfully submitted,

                                                   By: /s/ James E. Cecchi
                                                   James E. Cecchi
                                                   Michael A. Innes
                                                   Chirali V. Patel
                                                   **CARELLA, BYRNE, CECCHI, OLSTEIN,**
                                                   **BRODY & AGNELLO, P.C.**
                                                   5 Becker Farm Road
                                                   Roseland, New Jersey 07068
                                                   Telephone: (973) 994-1700
                                                   Facsimile: (973) 994-1744
                                                   Email: jcecchi@carellabyrne.com
                                                   Email: minnes@carellabyrne.com
                                                   Email: cpatel@carellabyrne.com

                                                   Steve W. Berman (to be admitted *pro hac vice*)
                                                   Thomas E. Loeser (to be admitted *pro hac vice*)
                                                   Jerrod C. Patterson (to be admitted *pro hac vice*)
                                                   **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                                   1301 Second Avenue, Suite 2000
                                                   Seattle, WA 98101
                                                   Telephone: (206) 623-7292
                                                   Facsimile: (206) 623-0594
                                                   Email: steve@hbsslaw.com
                                                   Email: toml@hbsslaw.com
                                                   Email: jerrodp@hbsslaw.com

                                                   *Co-Counsel for Plaintiffs and the Proposed Class*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: July 7, 2020                    Respectfully submitted,

                                       By: /s/ James E. Cecchi_____
                                       James E. Cecchi
                                       Michael A. Innes
                                       Chirali V. Patel
                                       **CARELLA, BYRNE, CECCHI, OLSTEIN,**
                                       **BRODY & AGNELLO, P.C.**
                                       5 Becker Farm Road
                                       Roseland, New Jersey 07068
                                       Telephone: (973) 994-1700
                                       Facsimile: (973) 994-1744
                                       Email: jcecchi@carellabyrne.com
                                       Email: minnes@carellabyrne.com
                                       Email: cpatel@carellabyrne.com

                                       Steve W. Berman (to be admitted *pro hac vice*)
                                       Thomas E. Loeser (to be admitted *pro hac vice*)
                                       Jerrod C. Patterson (to be admitted *pro hac vice*)
                                       **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       Email: steve@hbsslaw.com
                                       Email: toml@hbsslaw.com
                                       Email: jerrodp@hbsslaw.com

                                       *Co-Counsel for Plaintiffs and the Proposed Class*